2025 IL App (4th) 230491

NO. 4-23-0491

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
June 5, 2025
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS *ex rel.* KWAME RAOUL, Attorney General of the State of Illinois, | ) ) ) | Petition for review of order of Illinois Commerce Commission |
| Petitioner, | ) | |
| v. | ) | Nos. 22-0431 |
| THE ILLINOIS COMMERCE COMMISSION; AMEREN ILLINOIS COMPANY, d/b/a Ameren Illinois; CITIZENS UTILITY BOARD; NATURAL RESOURCES DEFENSE COUNCIL; ENVIRONMENTAL DEFENSE FUND; ENVIRONMENTAL LAW & POLICY CENTER; EVGO SERVICES, LLC; WALMART INC.; RESPIRATORY HEALTH ASSOCIATION; ELECTRIFY AMERICA, LLC; FREEWIRE TECHNOLOGIES, INC.; ILLINOIS COMPETITIVE ENERGY ASSOCIATION; SIERRA CLUB; ILLINOIS INDUSTRIAL ENERGY CONSUMERS; and THE ENVIRONMENTAL PROTECTION AGENCY, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | 22-0443 |
| Respondents. | ) | |

JUSTICE GRISCHOW delivered the judgment of the court, with opinion.
Justices Knecht and DeArmond concurred in the judgment and opinion.

**OPINION**

¶ 1      Petitioner, the People of the State of Illinois *ex rel.* Kwame Raoul, Attorney General of the State of Illinois, appeals the decision of the Illinois Commerce Commission (Commission) approving respondent Ameren Illinois Company's (Ameren) beneficial electrification plan (BEP) under section 45 of the Electric Vehicle Act (20 ILCS 627/45 (West 2022)). In June 2022, Ameren filed its petition for approval of its BEP with the Commission.

Respondents—Citizens Utility Board; Natural Resources Defense Council; Environmental Defense Fund; Environmental Law & Policy Center; EVGO Services, LLC; Walmart Inc.; Respiratory Health Association; Electrify America, LLC; Freewire Technologies, Inc.; Illinois Competitive Energy Association; Sierra Club; Illinois Industrial Energy Consumers; and the Illinois Environmental Protection Agency (IEPA)—intervened.

¶ 2 After extensive briefing and proceedings, the Commission filed a final order approving the BEP with modifications, requiring Ameren to increase its budget, and ordering Ameren to file a compliance report. In its final order, the Commission approved electric vehicle charging station rebates and interpreted section 45(g) of the Electric Vehicle Act to apply a 1% retail rate cap to all BEP revenue requirements. See *id.* § 45(g). The Commission also interpreted section 45(g) to apply solely to costs directly related to electric vehicle infrastructure, excluding bill and delivery credits to customers from the calculation of the BEP budget.

¶ 3 The Attorney General filed an application for rehearing, which the Commission denied, and appealed the Commission's final order approving the BEP with modifications. The Attorney General also filed a motion to reject Ameren's compliance filing, which the Commission denied.

¶ 4 On appeal, the Attorney General contends (1) the Commission lacked the authority to approve charging station rebates because section 55 of the Electric Vehicle Act gave exclusive authority to IEPA to issue such rebates, which could also lead to duplicate rebates (see *id.* § 55), (2) the rate cap in section 45(g) of Electric Vehicle Act must be narrowly calculated to include only Ameren's delivery service revenue requirement, (3) the rate cap should apply to all costs incurred under the BEP, (4) bill and delivery credits should be included in determining the BEP budget, and (5) the Commission improperly abdicated its administrative responsibilities and

delegated its ratemaking authority to Ameren when it approved the final order with modifications and required a compliance filing.

¶ 5    We affirm.

¶ 6                        I. BACKGROUND

¶ 7    In June 2022, Ameren submitted its BEP to the Commission docketed as case No. 22-0431. In July 2022, the Commission opened an investigation into Ameren's BEP, docketed as case No. 22-0443, and consolidated the two cases. The staff of the Commission and the Attorney General, in his role as the ratepayer advocate, participated in the proceeding, as did the intervenors. Because this appeal involves primarily matters of statutory application and interpretation, we first provide the primary statutory provisions underlying the proceedings.

¶ 8              A. The Electric Vehicle Act and Related Statutory Provisions

¶ 9    In September 2021, the General Assembly passed Public Act 102-662 (eff. Sept. 15, 2021), also known as the Climate and Equitable Jobs Act, with the goal to put the state on a path toward 100% clean energy, invest in training a diverse workforce for the jobs of the future, institute key ratepayer and residential customer protections, and prioritize meaningful ethics and transparency reforms. See *People ex rel. Raoul v. Illinois Commerce Comm'n*, 2025 IL App (2d) 230020, ¶ 3 (describing the legislation); compare Pub. Act 102-662 (eff. Sept. 15, 2021) (enacted into law with no official name), with Pub. Act 103-580 (eff. Dec. 8, 2023) (adding 20 ILCS 3855/1-129, which refers to Public Act 102-662 as the Climate and Equitable Jobs Act). Relevant here, the Climate and Equitable Jobs Act amended the Public Utilities Act (220 ILCS 5/1-101 *et seq.* (West 2022)) and the Electric Vehicle Act (20 ILCS 627/1 *et seq.* (West 2022)) in furtherance of those goals.

¶ 10   In particular, the Climate and Equitable Jobs Act added section 45 to the Electric

- 3 -

Vehicle Act, which created requirements regarding "beneficial electrification programs" (BE programs). *Id.* § 45. In adding those requirements, the General Assembly intended to "decrease reliance on fossil fuels, reduce pollution from the transportation sector, increase access to electrification for all consumers, and ensure that electric vehicle adoption and increased electricity usage and demand do not place significant additional burdens on the electric system and [do] create benefits for Illinois residents." *Id.* § 45(a). The Electric Vehicle Act lists 10 policy considerations or goals:

"(1) Illinois should increase the adoption of electric vehicles in the State to 1,000,000 by 2030.

(2) Illinois should strive to be the best state in the nation in which to drive and manufacture electric vehicles.

(3) Widespread adoption of electric vehicles is necessary to electrify the transportation sector, diversify the transportation fuel mix, drive economic development, and protect air quality.

(4) Accelerating the adoption of electric vehicles will drive the decarbonization of Illinois' transportation sector.

(5) Expanded infrastructure investment will help Illinois more rapidly decarbonize the transportation sector.

(6) Statewide adoption of electric vehicles requires increasing access to electrification for all consumers.

(7) Widespread adoption of electric vehicles requires increasing public access to charging equipment throughout Illinois, especially in low-income and environmental justice communities, where levels of air pollution burden tend to be

- 4 -

higher.

(8) Widespread adoption of electric vehicles and charging equipment has the potential to provide customers with fuel cost savings and electric utility customers with cost-saving benefits.

(9) Widespread adoption of electric vehicles can improve an electric utility's electric system efficiency and operational flexibility, including the ability of the electric utility to integrate renewable energy resources and make use of off-peak generation resources that support the operation of charging equipment.

(10) Widespread adoption of electric vehicles should stimulate innovation, competition, and increased choices in charging equipment and networks and should also attract private capital investments and create high-quality jobs in Illinois." *Id.* § 45(a)(1)-(10).

¶ 11 The Electric Vehicle Act defines BE programs as "programs that lower carbon dioxide emissions, replace fossil fuel use, create cost savings, improve electric grid operations, reduce increases to peak demand, improve electric usage load shape, and align electric usage with times of renewable generation." *Id.* § 45(b). As part of that definition, it also provides, "All [BE programs] shall provide for incentives such that customers are induced to use electricity at times of low overall system usage or at times when generation from renewable energy sources is high." *Id.* It then provides that BE programs "include a portfolio of the following":

"(1) time-of-use electric rates;

(2) hourly pricing electric rates;

(3) optimized charging programs or programs that encourage charging at times beneficial to the electric grid;

(4) optional demand-response programs specifically related to electrification efforts;

(5) incentives for electrification and associated infrastructure tied to using electricity at off-peak times;

(6) incentives for electrification and associated infrastructure targeted to medium-duty and heavy-duty vehicles used by transit agencies;

(7) incentives for electrification and associated infrastructure targeted to school buses;

(8) incentives for electrification and associated infrastructure for medium-duty and heavy-duty government and private fleet vehicles;

(9) low-income programs that provide access to electric vehicles for communities where car ownership or new car ownership is not common;

(10) incentives for electrification in eligible communities;

(11) incentives or programs to enable quicker adoption of electric vehicles by developing public charging stations in dense areas, workplaces, and low-income communities;

(12) incentives or programs to develop electric vehicle infrastructure that minimizes range anxiety, filling the gaps in deployment, particularly in rural areas and along highway corridors;

(13) incentives to encourage the development of electrification and renewable energy generation in close proximity in order to reduce grid congestion;

(14) offer support to low-income communities who are experiencing financial and accessibility barriers such that electric vehicle ownership is not an

option; and

(15) other such programs as defined by the Commission." *Id.* § 45(b).

¶ 12 The Electric Vehicle Act requires utilities serving more than 500,000 customers to file with the Commission a BEP that outlines the utility's BE programs. *Id.* § 45(d). The process begins with a workshop between Commission staff and each utility for the purpose of "soliciting input on the design of [BE] programs that the utility shall offer." *Id.* § 45(c).

¶ 13 Each utility's BE plan must take into consideration the recommendations from the workshop with the staff. *Id.* § 45(d). After the plan is filed, the Commission must investigate the plan "to consider whether the plan meets the objectives and contains the information required by this Section." *Id.* Referring to IEPA as the "Agency" (see *id.* § 45(b)), the proposed plan must address, "at a minimum, the following":

"(i) make-ready investments to facilitate the rapid deployment of charging equipment throughout the State, facilitate the electrification of public transit and other vehicle fleets in the light-duty, medium-duty, and heavy-duty sectors, and align with Agency-issued rebates for charging equipment;

(ii) the development and implementation of [BE programs], including time-of-use rates and their benefit for electric vehicle users and for all customers, optimized charging programs to achieve savings identified, and new contracts and compensation for services in those programs, through signals that allow electric vehicle charging to respond to local system conditions, manage critical peak periods, serve as a demand response or peak resource, and maximize renewable energy use and integration into the grid;

(iii) optional commercial tariffs utilizing alternatives to traditional demand-

- 7 -

based rate structures to facilitate charging for light-duty, heavy-duty, and fleet electric vehicles;

(iv) financial and other challenges to electric vehicle usage in low-income communities, and strategies for overcoming those challenges, particularly in communities and for people for whom car ownership is not an option;

(v) methods of minimizing ratepayer impacts and exempting or minimizing, to the extent possible, low-income ratepayers from the costs associated with facilitating the expansion of electric vehicle charging;

(vi) plans to increase access to Level 3 Public Electric Vehicle Charging Infrastructure to serve vehicles that need quicker charging times and vehicles of persons who have no other access to charging infrastructure, regardless of whether those projects participate in optimized charging programs;

(vii) whether to establish charging standards for type of plugs eligible for investment or incentive programs, and if so, what standards;

(viii) opportunities for coordination and cohesion with electric vehicle and electric vehicle charging equipment incentives established by any agency, department, board, or commission of the State, any other unit of government in the State, any national programs, or any unit of the federal government;

(ix) ideas for the development of online tools, applications, and data sharing that provide essential information to those charging electric vehicles, and enable an automated charging response to price signals, emission signals, real-time renewable generation production, and other Commission-approved or customer-desired indicators of beneficial charging times; and

(x) customer education, outreach, and incentive programs that increase awareness of the programs and the benefits of transportation electrification, including direct outreach to eligible communities." *Id.* § 45(d)(i)-(x).

" 'Make-ready infrastructure' means the electrical and construction work necessary between the distribution circuit to the connection point of charging equipment." *Id.* § 45(b).

¶ 14 Further, the "Commission shall determine if the proposed plan is cost-beneficial and in the public interest." *Id.* § 45(d). Section 45(d) provides:

"The plan shall be determined to be cost-beneficial if the total cost of beneficial electrification expenditures is less than the net present value of increased electricity costs (defined as marginal avoided energy, avoided capacity, and avoided transmission and distribution system costs) avoided by programs under the plan, the net present value of reductions in other customer energy costs, net revenue from all electric charging in the service territory, and the societal value of reduced carbon emissions and surface-level pollutants, particularly in environmental justice communities. The calculation of costs and benefits should be based on net impacts, including the impact on customer rates." *Id.*

Section 45(d) specifies eight public-interest criteria for the Commission to consider:

"(1) maximize total energy cost savings and rate reductions so that nonparticipants can benefit;

(2) address environmental justice interests by ensuring there are significant opportunities for residents and businesses in eligible communities to directly participate in and benefit from [BE] programs;

(3) support at least a 40% investment of make-ready infrastructure

incentives to facilitate the rapid deployment of charging equipment in or serving environmental justice, low-income, and eligible communities; however, nothing in this subsection is intended to require a specific amount of spending in a particular geographic area;

(4) support at least a 5% investment target in electrifying medium-duty and heavy-duty school bus and diesel public transportation vehicles located in or serving environmental justice, low-income, and eligible communities in order to provide those communities and businesses with greater economic investment, transportation opportunities, and a cleaner environment so they can directly benefit from transportation electrification efforts; however, nothing in this subsection is intended to require a specific amount of spending in a particular geographic area;

(5) stimulate innovation, competition, private investment, and increased consumer choices in electric vehicle charging equipment and networks;

(6) contribute to the reduction of carbon emissions and meeting air quality standards, including improving air quality in eligible communities who disproportionately suffer from emissions from the medium-duty and heavy-duty transportation sector;

(7) support the efficient and cost-effective use of the electric grid in a manner that supports electric vehicle charging operations; and

(8) provide resources to support private investment in charging equipment for uses in public and private charging applications, including residential, multi-family, fleet, transit, community, and corridor applications." *Id.* § 45(d)(1)-(8)

Section 45 further provides that "[t]he retail rate impact from the development of

electric vehicle infrastructure shall not exceed 1% per year of the total annual revenue requirements of the utility." *Id.* § 45(g).

¶ 16        Meanwhile, section 55 of the Electric Vehicle Act requires IEPA to issue charging station rebates, providing:

"(a) In order to substantially offset the installation costs of electric vehicle charging infrastructure, beginning July 1, 2022, and continuing as long as funds are available, the Agency shall issue rebates, consistent with the Commission-approved Beneficial Electrification Plans in accordance with Section 45, to public and private organizations and companies to install and maintain Level 2 or Level 3 charging stations.

(b) The Agency shall award rebates or grants that fund up to 80% of the cost of the installation of charging stations. The Agency shall award additional incentives per port for every charging station installed in an eligible community and every charging station located to support eligible persons. In order to be eligible to receive a rebate or grant, the organization or company must submit an application to the Agency and commit to paying the prevailing wage for the installation project. The Agency shall by rule provide application and other programmatic details and requirements, including additional incentives for eligible communities. The Agency may determine per port or project caps based on a review of best practices and stakeholder engagement. The Agency shall accept applications on a rolling basis and shall award rebates or grants within 60 days of each application. The Agency must require that any grant or rebate applicant comply with the requirements of the Prevailing Wage Act for any installation of a charging station

for which it seeks a rebate or grant." *Id.* § 55.

Section 15 of the Electric Vehicle Act provides for an "Electric-Vehicle Coordinator," who shall act as a point person for electric-vehicle-related and electric-vehicle-charging-related policies and activities in Illinois, including the issuance of rebates for consumers and electric vehicle charging rebates for organizations and companies. *Id.* § 15.

¶ 17                                             B. Ameren's BEP

¶ 18          Before Ameren submitted its BEP, the relevant parties took part in the workshop process, with 10 workshops held between the initiation of the process and February 29, 2022. After Ameren filed its BEP, the parties engaged in extensive briefing and provided written direct expert testimony.

¶ 19          Ameren's BEP described existing costs, programs, spending, and rates (often referred to as "tariffs" in the documents) designed to address the requirements of section 45 of Electric Vehicle Act, including programs Ameren already had in place to incentivize electric vehicle charging at off-peak hours by providing certain credits on customers' electric bills. Ameren also included additional programs and modifications to existing programs it proposed to implement in accordance with section 45. Those programs included additional customer education and outreach, incentives for electric vehicle adoption and charging, and programs focused on ensuring the benefits of electrification in equity investment eligible communities and/or low-income areas.

¶ 20          Three of Ameren's BE programs are at issue on appeal. Those programs, which the parties generally refer to as "rebate programs," pertain to (1) educational facilities, (2) transit facilities, and (3) driver's education. The programs include various incentives, including bill credits to encourage electric vehicle adoption, delivery credits for grid-beneficial charging

behavior, supplemental line extension allowances to defray the cost of grid upgrades to connect chargers, and charger installation credits to defray the costs of chargers for education and transit facilities.

¶ 21    The BEP provided the charger programs for education and transit facilities would increase the line extension allowance in equity investment eligible and/or low-income areas and introduce rebates for level 2 or level 3 charging equipment and installation in such areas. The driver's education program would provide financial assistance to high schools in equity investment eligible and/or low-income communities to purchase electric vehicles and install charging equipment.

¶ 22    In December 2022, an administrative law judge (ALJ) held an evidentiary hearing, during which the parties submitted evidence, including the written direct testimony of witnesses. The ALJ issued a proposed written order for the Commission's review. The parties filed various exceptions to the ALJ's order.

¶ 23    In his briefs to the Commission, the Attorney General raised four issues relevant to this appeal, arguing (1) the Commission lacked authority to approve charging station rebates because section 55 of Electric Vehicle Act gave exclusive authority to IEPA to issue such rebates and there was a possibility of duplicate rebates, (2) the rate cap in section 45(g) of Electric Vehicle Act must be narrowly calculated to include only Ameren's delivery service revenue requirement, (3) the rate cap should apply to all costs incurred under the BEP, and (4) bill and delivery credits should be included in determining the cost of the BEP.

¶ 24    Regarding bill and delivery credits, Victoria Kilhoffer, a regulatory specialist for Ameren, had provided written direct surrebuttal testimony where she was asked whether she agreed with a suggestion by Commission staff and the Attorney General that Ameren's BEP

budget include bill and delivery credits. Kilhoffer testified she did not agree and stated:

> "No, I do not. [A staff member] says '[a]lthough the bill/delivery credits represent a reduction in the Company's delivery service revenue, rather than an outlay for cost, the bill/delivery credits will ultimately be recovered from ratepayers.' [Citation]. I agree with the first half of this statement and disagree with the second. Reducing the revenue does not add a cost to be collected in Ameren's revenue requirement, so there is nothing to be recovered from customers. While I agree that the bill credits ultimately lower revenue in the short term, to state it in this way ignores the fact that were it not for the [electric vehicles] added to the system, this additional [electric vehicle charging program] revenue would not exist and thus not need to be lowered. There is far more added revenue than is represented by the bill credits and this revenue is also not appropriate to add to the retail rate impact. In the same manner that [a staff witness] and I both reject [an intervenor's] argument to include this increased revenue, I also reject the argument to include the bill credits. The revenue from [electric vehicle] charging and the bill credits to [electric vehicle charging program] customers are two sides to the same coin and both should be rejected."

¶ 25                              C. The Commission's Final Order

¶ 26        On March 23, 2023, the Commission issued a final order approving the BEP with modifications and ordered Ameren to submit a compliance filing consisting of a revised BEP that incorporated the modifications. In its order, the Commission rejected the Attorney General's arguments concerning rebates, the retail cap, and the inclusion of bill and delivery credits in the BEP budget.

¶ 27       Regarding rebates, the Commission found the rebates did not conflict with IEPA's authority. It further found none of the proposed rebates duplicated rebates available through IEPA programs. The Commission stated it would not opine whether the rebates could conflict in the future because it would be improper to make that decision prospectively. The Commission wrote that whether any proposed rebates should or should not be included in a future BEP would require an examination of the specific rebates proposed.

¶ 28       As to the rate cap, the Commission applied a plain language interpretation of section 45(g) of the Electric Vehicle Act that "[t]he retail rate impact from the development of electric vehicle infrastructure shall not exceed 1% per year of the total annual revenue requirements of the utility." 20 ILCS 627/45(g) (West 2022). Applying its reasoning from another BEP proceeding involving a different utility, Commonwealth Edison (see *Commonwealth Edison Co.*, Ill. Comm. Comm'n, No. 22-0432 (Order-Interim Nov. 10, 2022)) (ComEd order), the Commission found the cap applied narrowly to the "development of [electric vehicle] infrastructure." Thus, the Commission found the amount of spending subject to the cap was not that of the entire BEP, but only the amount of programs approved for electric vehicle infrastructure. The Commission stated it was sympathetic to the Attorney General's goal of protecting ratepayers, but it could not overlook the plain language of the statute. The Commission also found the required cost-benefit analysis applicable to the spending amount of the overall plan under section 45(d) of the Electric Vehicle Act served as an additional restraint on the amount of spending.

¶ 29       Also applying its reasoning from the ComEd order, the Commission further rejected the Attorney General's argument the rate cap should be restricted to 1% of the utility's "delivery services rate requirement." Applying the plain language of section 45(g) of the Electric Vehicle Act, the Commission found the phrase "total annual revenue requirements" did not limit

the cap to only the revenue requirement for delivery services. The Commission found the Attorney General's interpretation would require the Commission to read into the statute a limitation that did not exist in its plain language and thus would violate principles of statutory interpretation.

¶ 30 Finally, the Commission found bill and delivery credits should not be factored into the BEP budget. The Commission noted Kilhoffer's testimony and found the credits were an element of Ameren's overall rate design and a function of the revenues collected from ratepayers, rather than an increase in cost.

¶ 31 When the Commission ordered modifications, it specifically found the budget should be increased to accommodate the modifications. The modifications ordered by the Commission included requirements for Ameren to expand subsidies for certain electric line extensions and account for differences in cost between different electric vehicle chargers. The Commission also adopted a proposal that customers be allowed to use electric line extension funds for electrification expenses "on the customer side of the meter" to the extent the budget allowed, the BEP remained under the rate cap, and the BEP remained cost-beneficial. The Commission further ordered Ameren to adopt programs advanced by other parties. When discussing the details of the modifications, the Commission referred to the positions of various parties on the matters.

¶ 32 Regarding the BEP budget, when discussing supplemental line extensions, the Commission noted Ameren's proposed budget was "quite small compared to the rate cap." The Commission directed Ameren to seek Commission authorization if it intended to spend more than its entire approved BEP budget. The Commission also provided Ameren could file a petition with the Commission if it anticipated its spending would exceed the approved BEP budget. The order included a detailed cost-benefit analysis.

¶ 33 In its overall findings, the Commission specifically determined Ameren's BEP as

modified met the statutory and policy requirements of the Electric Vehicle Act and was reasonable, cost-beneficial, and in the public interest. The Commission required Ameren to share a draft compliance BEP with Commission staff and intervenors, who would provide feedback regarding whether the compliance BEP accurately reflected the Commission's final order.

¶ 34    The order stated, "[Ameren] shall implement the [BEP] as approved by this Order." It also stated "any motions, petitions, objections, or other matters in this proceeding that remain outstanding are hereby disposed of consistent with the conclusions herein." It further stated, "[T]his Order is final; it is not subject to the Administrative Review Law." The order provided any motion for rehearing must be filed within 30 days.

¶ 35    On April 24, 2023, the Attorney General filed an application for rehearing. On May 4, 2023, the Commission denied the application.

¶ 36    On May 31, 2023, Ameren filed its compliance filing with a revised BEP. Ameren provided a three-year budget total of approximately $64.52 million. Ameren defined "electric vehicle infrastructure" to include "supplemental allowances for line and service extensions, customer owned make-ready infrastructure, and rebate programs for charging equipment and wiring." In later briefing, Ameren noted that definition was consistent with its prior BEP as approved by the Commission's final order. Under the revised BEP, $47,486 of approximately $6.73 million total spending for 2023 counted toward the rate cap. For 2024, approximately $10.69 million of $21.49 million counted toward the cap. In 2025, approximately $21.28 million of $36.31 million counted toward the cap.

¶ 37    On June 7, 2023, the Attorney General timely filed his notice of appeal. On June 9, 2023, the Attorney General filed a motion for clarification and to reject Ameren's compliance filing. An intervenor also filed a motion for clarification. In his motion, the Attorney General

argued Ameren's compliance filing was inconsistent with the final order in several respects, including the amount of increase to Ameren's budget needed to accommodate the additional programs and Ameren's interpretation of the rate cap. The Attorney General also argued the BEP was no longer cost-beneficial.

¶ 38    On July 13, 2023, the Commission denied the Attorney General's motion and granted the intervenor's motion. In its order, the Commission stated the matter was reopened for the limited purpose of granting the intervenor's motion for clarification. The Commission ordered Ameren to submit an amended compliance filing within five days addressing its grant of the intervenor's motion, which required Ameren to adopt certain program standards. Ameren filed its amended BEP on July 18, 2023.

¶ 39                          II. ANALYSIS

¶ 40    On appeal, the Attorney General contends (1) the Commission lacked authority to approve charging station rebates because section 55 of the Electric Vehicle Act gave exclusive authority to IEPA to issue such rebates, which could also lead to duplicate rebates, (2) the rate cap in section 45(g) of the Electric Vehicle Act must be narrowly calculated to include only Ameren's delivery service revenue requirement, (3) the rate cap should apply to all costs incurred under the BEP, (4) bill and delivery credits should be included in determining the BEP budget, and (5) the Commission improperly abdicated its administrative responsibilities and delegated its ratemaking authority to Ameren when it approved the final order with modifications and required a compliance filing.

¶ 41                          A. Jurisdiction

¶ 42    We first address our jurisdiction over this appeal. Before addressing the merits of an appeal, we have an obligation to determine whether we have jurisdiction, even though the

parties did not raise the issue. *Erickson v. Knox County Wind Farm LLC*, 2024 IL App (4th) 230726, ¶ 61.

¶ 43　　　　" 'The jurisdiction of the appellate court is limited to the review of appeals from final judgments, subject to statutory or supreme court exceptions.' " *Id.* (quoting *In re Estate of Devey*, 239 Ill. App. 3d 630, 632 (1993)). Here, the Attorney General appeals from a decision of the Commission, an administrative body. "This court has jurisdiction to review administrative decisions only as provided by law, and we must exercise special statutory jurisdiction to review such administrative action." *People ex rel. Madigan v. Illinois Commerce Comm'n*, 407 Ill. App. 3d 207, 211 (2010) (citing Ill. Const. 1970, art. VI, § 6; *Town & Country Utilities, Inc. v. Illinois Pollution Control Board*, 225 Ill. 2d 103, 121 (2007)). "Accordingly, the statute that confers special statutory jurisdiction to an appellate court to review an administrative decision also limits it." *Id.* Direct appeals to the appellate court from Commission decisions are governed by the Public Utilities Act. 220 ILCS 5/10-201(a) (West 2022); *Quality Saw & Seal, Inc. v. Illinois Commerce Comm'n*, 374 Ill. App. 3d 776, 780 (2007). However, under Illinois Supreme Court Rule 335(h), (i)(1) (eff. July 1, 2017), addressing direct review of administrative orders by the appellate court, insofar as appropriate, the provisions of Illinois Supreme Court Rule 301 (eff. Feb. 1, 1994) through Illinois Supreme Court Rule 373 (eff. July 1, 2017), which include rules pertaining to final-order requirements, are applicable to such appeals. See *Madigan*, 407 Ill. App. 3d at 222 (applying Illinois Supreme Court Rule 303(a)(2) (eff. May 30, 2008) to an appeal of the Commission's decision).

¶ 44　　　　A judgment is final for purposes of appeal if it determines the litigation on the merits or some definite part thereof so that, if affirmed, the only thing remaining is to proceed with the execution of the judgment. *In re Marriage of Verdung*, 126 Ill. 2d 542, 553 (1989). A final

order disposing of fewer than all claims is not an appealable order and does not become appealable until all of the claims are resolved. *Marsh v. Evangelical Covenant Church of Hinsdale*, 138 Ill. 2d 458, 464 (1990).

¶ 45          Under section 10-201(a) of the Public Utilities Act:

"Within 35 days from the date that a copy of the order or decision sought to be reviewed was served upon the party affected by any order or decision of the Commission refusing an application for a rehearing of any rule, regulation, order or decision of the Commission, including any order granting or denying interim rate relief, or within 35 days from the date that a copy of the order or decision sought to be reviewed was served upon the party affected by any final order or decision of the Commission upon and after a rehearing of any rule, regulation, order or decision of the Commission, including any order granting or denying interim rate relief, any person or corporation affected by such rule, regulation, order or decision, may appeal to the appellate court of the judicial district in which the subject matter of the hearing is situated, or if the subject matter of the hearing is situated in more than one district, then of any one of such districts, for the purpose of having the reasonableness or lawfulness of the rule, regulation, order or decision inquired into and determined." 220 ILCS 5/10-201(a) (West 2022).

In an appeal from a Commission order, "[t]he court first acquiring jurisdiction of any appeal from any rule, regulation, order or decision shall have and retain jurisdiction of such appeal and of all further appeals from the same rule, regulation, order or decision until such appeal is disposed of in such appellate court." *Id.*

¶ 46          Here, the Attorney General was authorized to file a motion for rehearing within 30

days of the final order. The Commission filed its final order on March 23, 2023, and the Attorney General filed his motion for rehearing on April 24, 2023. While the motion here was filed on day 32, it was nevertheless effective because day 30 in 2023 fell on a Saturday. See 5 ILCS 70/1.11 (West 2022). Then, the Attorney General timely filed his notice of appeal within 35 days from the denial of the motion for rehearing.

¶ 47 After the Attorney General filed his appeal, he filed a motion for clarification and to reject Ameren's compliance filing, which the Commission denied. Meanwhile, the court granted an intervenor's motion for clarification and ordered Ameren to file a new compliance filing, which it did. To the extent those actions could be viewed to render the Commission's initial order nonfinal, first note section 10-201(a) of the Public Utilities Act confers jurisdiction to hear an appeal of *any* order or decision of the Commission refusing an application for a rehearing of any rule, regulation, order, or decision of the Commission. 220 ILCS 5/10-201(a) (West 2022). Then, the appellate court shall have and retain jurisdiction of the appeal and of all further appeals from the same rule, regulation, order, or decision until such appeal is disposed of in the appellate court. *Id.* Thus, this court gained jurisdiction and retained it when the Attorney General timely appealed from the denial of his motion for rehearing.

¶ 48 Further, the March 23, 2023, final order of the Commission approved the BEP as modified. Thus, at that time, as also specifically stated by the order, the Commission decided the issues presented and the order was actually "final." At that point, the compliance filing was merely an ancillary matter to ensure the BEP was consistent with that final order. Generally, collateral or incidental matters do not affect or alter the issue from which a notice of appeal was filed. See *General Motors Corp. v. Pappas*, 242 Ill. 2d 163, 174 (2011). "[A]n order is final where matters left for future determination are merely incidental to the ultimate rights which have been

adjudicated by the order." *In re Petition to Incorporate the Village of Greenwood*, 275 Ill. App. 3d 465, 470 (1995). Here, the compliance filing was merely incidental to the rights adjudicated by the Commission's final order. Accordingly, we have jurisdiction over the appeal.

¶ 49                    B. Statutory Interpretation and Standards of Review

¶ 50            The issues in this appeal primarily present issues of statutory interpretation. "The primary objective in interpreting a statute is to ascertain and give effect to the intent of the legislature." *Raoul*, 2025 IL App (2d) 230020, ¶ 27. "The best evidence of the legislature's intent is the language of the statute itself." *Id.* "Statutes must not be read in isolation, but as a whole; all relevant parts of the statute must be considered when courts attempt to define the legislative intent underlying the statute." *Id.* "Moreover, when an act defines its terms, those terms must be construed according to the definitions contained in the act." *Id.*

¶ 51            "When statutory language is unambiguous, we must apply the language as written, without looking to other statutory-interpretation tools." *Merritt v. Department of State Police*, 2016 IL App (4th) 150661, ¶ 20. "We read the statutory provisions in concert and harmonize them, avoiding an interpretation rendering part of the statute superfluous." *Id.* We also must give clear and unambiguous statutory language its effect as written, without reading into it exceptions, limitations, or conditions that the legislature did not express. *Maxit, Inc. v. Van Cleve*, 231 Ill. 2d 229, 239 (2008).

¶ 52            A court need not interpret a statute literally if it would lead to absurd results. *Scott v. American Alliance Casualty Co.*, 2024 IL App (4th) 231305, ¶ 21. However, we may not, under the guise of statutory interpretation, correct a legislative oversight by rewriting a statute in a manner inconsistent with its clear and unambiguous language. *Id.* Nor may we ignore or rewrite statutory language on the basis that, as written, it produces an undesirable policy result. *Id.* Thus,

" '[w]here the words employed in a legislative enactment are free from ambiguity or doubt, they must be given effect by the courts even though the consequences may be harsh, unjust, absurd or unwise.' " *Id.* (quoting *County of Knox ex rel. Masterson v. Highlands, L.L.C.*, 188 Ill. 2d 546, 557 (1999)). Such consequences can only be remedied by a change in the law. *Id.*

¶ 53 "Courts are not bound by the Commission's rulings on questions of law, which we review *de novo*." *Raoul*, 2025 IL App (2d) 230020, ¶ 28 (citing *Illinois Landowners Alliance, NFP v. Illinois Commerce Comm'n*, 2017 IL 121302, ¶ 29). However, courts consistently afford substantial weight and deference to the Commission's interpretation of a statute that it is charged with administering and enforcing. *Id.* " 'A significant reason for this deference is that courts appreciate that agencies can make informed judgments upon the issues, based upon their experience and expertise.' " *Id.* (quoting *Illinois Consolidated Telephone Co. v. Illinois Commerce Comm'n*, 95 Ill. 2d 142, 153 (1983)). This court has described the deference given as "extreme." *Harrisonville Telephone Co. v. Illinois Commerce Comm'n*, 343 Ill. App. 3d 517, 523 (2003), *aff'd*, 212 Ill. 2d 237 (2004). However, we are not necessarily bound by the Commission's statutory interpretation. *Id.* "A court may overturn the Commission's interpretation of its own rules if its construction is clearly erroneous, arbitrary, or unreasonable." *Ameren Illinois Co. v. Illinois Commerce Comm'n*, 2012 IL App (4th) 100962, ¶ 61. In addition, less deference will be afforded when the Commission's decision is a departure from past practice. *Id.*

¶ 54 When considering the propriety of a Commission decision, we take the findings and conclusions of the Commission on questions of fact as *prima facie* true and consider any rule, regulation, order, or decision of the Commission *prima facie* reasonable. 220 ILCS 5/10-201(d) (West 2022). Such factual determinations will be disturbed on review only if not supported by substantial evidence. *Citizens Utility Board v. Illinois Commerce Comm'n*, 2016 IL App (1st)

152936, ¶ 16 (citing 220 ILCS 5/10-201(e)(iv)(A) (West 2014)). This court has held the substantial-evidence standard is the same as the manifest-weight standard. *Save Our Illinois Land v. Illinois Commerce Comm'n*, 2022 IL App (4th) 210008, ¶ 37 (citing *Kaloo v. Zoning Board of Appeals*, 274 Ill. App. 3d 927, 934 (1995)). " '[A] finding is against the manifest weight of the evidence if all reasonable persons would agree that the finding is erroneous and that the opposite conclusion is evident.' " *Id.* (quoting *Kaloo*, 274 Ill. App. 3d at 934). The person or corporation appealing from Commission rules, regulations, orders, or decisions has the burden of proof for all issues raised on appeal. 220 ILCS 5/10-201(d) (West 2022).

¶ 55        This case involves precisely the type of complex statute where the Commission's experience and expertise is valuable. Thus, as we discuss further below, where applicable, we afford substantial weight and deference to the Commission's interpretation of the Electric Vehicle Act. See *Commonwealth Edison Co. v. Illinois Commerce Comm'n*, 2019 IL App (2d) 180504, ¶ 56.

¶ 56        C. Commission's Authority to Authorize Charger Installation Rebates

¶ 57        The Attorney General first contends the Commission lacked authority to authorize Ameren to include charger installation rebates in its BEP. The Attorney General argues the Electric Vehicle Act's sections 40, 45, and 55 grant exclusive authority to IEPA to issue such rebates.

¶ 58        Section 55 of the Electric Vehicle Act provides, in part:

"(a) In order to substantially offset the installation costs of electric vehicle charging infrastructure, beginning July 1, 2022, and continuing as long as funds are available, the Agency shall issue rebates, consistent with the Commission-approved Beneficial Electrification Plans in accordance with Section 45, to public and private organizations and companies to install and maintain Level 2 or Level 3 charging

- 24 -

stations." 20 ILCS 627/55 (West 2022).

Section 55(b) provides further details concerning the rebates. See *id.* § 55(b). Section 40 allows IEPA rulemaking authority. See *id.* § 40.

¶ 59 Meanwhile, in its definition of BE programs, the Electric Vehicle Act provides "[BE] programs shall provide for incentives such that customers are induced to use electricity at times of low overall system usage or at times when generation from renewable energy sources is high." *Id.* § 45(b). Section 45 then further states 15 examples of programs included in a BEP portfolio, including a number of incentives, such as incentives for (1) electrification and associated infrastructure tied to using electricity at off-peak times; (2) electrification and associated infrastructure targeted to school buses; (3) low-income programs that provide access to electric vehicles for communities where car ownership or new car ownership is not common; (4) electrification in eligible communities; and (5) incentives to enable quicker adoption of electric vehicles by developing public charging stations in dense areas, workplaces, and low-income communities. *Id.*

¶ 60 The BEP must also include, "at a minimum," 10 items, including (1) "make-ready investments to facilitate the rapid deployment of charging equipment throughout the State, facilitate the electrification of public transit and other vehicle fleets in the light-duty, medium-duty, and heavy-duty sectors, and align with Agency-issued rebates for charging equipment" (*id.* § 45(d)(i) and (2) "opportunities for coordination and cohesion with electric vehicle and electric vehicle charging equipment incentives established by any agency, department, board, or commission of the State, any other unit of government in the State, any national programs, or any unit of the federal government" (*id.* § 45(d)(viii)).

¶ 61 When considering whether a BEP is in the public interest, the Commission must

consider eight items, including, in part, whether the investments and other expenditures are reasonably expected to "support at least a 40% investment of make-ready infrastructure incentives to facilitate the rapid deployment of charging equipment in or serving environmental justice, low-income, and eligible communities." *Id.* § 45(d)(3). "Make-ready infrastructure" means the electrical and construction work necessary between the distribution circuit to the connection point of charging equipment. *Id.* § 45(b).

¶ 62 Section 15 of the Electric Vehicle Act provides for an "Electric Vehicle Coordinator," who shall act as a point person for electric-vehicle-related and electric-vehicle-charging-related policies and activities in Illinois, including the issuance of rebates for consumers and electric vehicle charging rebates for organizations and companies. *Id.* § 15.

¶ 63 Here, the Attorney General argues the provisions providing for IEPA rebates for level 2 or level 3 charging stations grant excusive authority over such rebates to IEPA. But nothing in section 55 mentions exclusivity. To the contrary, when read together, the provisions of the Electric Vehicle Act envision coordination between IEPA and utility providers. Indeed, section 15 of the Electric Vehicle Act provides for a person to coordinate rebates. *Id.* Then, section 55 provides that any agency-issued rebates be "consistent with the Commission-approved [BEPs] in accordance with Section 45." *Id.* § 55(a). Meanwhile, section 45 requires the BEP to "align with Agency-issued rebates for charging equipment." *Id.* § 45(d)(i). While section 55 requires IEPA to issue rebates, none of the provisions provide that only IEPA may do so or that a utility may not also issue rebates when IEPA has done so. The Attorney General's argument would have this court impermissibly read such a provision into the plain language of the Electric Vehicle Act.

¶ 64 Nevertheless, the Attorney General argues section 45 specifically focuses on "make-ready infrastructure" to "facilitate" the rapid deployment of charging equipment. The

Attorney General points to such provisions as evidence the legislature intended incentives or rebates to apply only to infrastructure incentives and not to the chargers themselves and that it meant for IEPA to have exclusive authority over charger installation rebates. But while the legislature required the BEP "at a minimum" to address incentives for charging infrastructure, it did not limit it. The provisions concerning make-ready investments or infrastructure are merely a small part of the overall statutory scheme, which, for example, in the description of a BEP, also includes items as broad as "incentives for electrification in eligible communities" and incentives both for electrification *and* associated infrastructure targeted to school buses. *Id.* § 45(b). Nothing limits such provisions solely to make-ready infrastructure. Meanwhile, the statutory scheme includes no provisions specifically providing the interpretation the Attorney General asks us to adopt.

¶ 65        Further, among the minimum required items, the BEP must include, not only make-ready investments to facilitate the rapid deployment of charging equipment and align with Agency-issued rebates for charging equipment, but also "opportunities for coordination and cohesion with electric vehicle and electric vehicle charging equipment incentives established by any agency, department, board, or commission of the State, any other unit of government in the State, any national programs, or any unit of the federal government." *Id.* § 45(d)(viii). Thus, the Electric Vehicle Act not only envisions a variety of incentives, including incentives related to charging; it also recognizes that other entities, not just limited to a utility or IEPA, might also issue related incentives. Those provisions do not show an intent to limit the extent of incentives that may be provided by the utility. To accept the Attorney General's argument, this court would be required to read the words "at a minimum" out of the statute while simultaneously reading various limitations into it. Accepting the Attorney General's argument would also be at odds with the

- 27 -

Electric Vehicle Act's broad and ambitious policy goals.

¶ 66      The Attorney General also argues that an interpretation allowing both IEPA and a utility provider to issue rebates would enable the Commission to establish identical rebate programs as IEPA. But by providing for an electric vehicle coordinator and requiring rebates to be consistent with BEPs and then requiring BEPs to align with IEPA-issued rebates, the statutory provisions address that concern. Nor does the Electric Vehicle Act state any limit on duplicate incentives. Further, the Attorney General's argument is speculative. Nothing indicates duplicate rebates have occurred or that they will. Had the legislature intended to limit the authority to issue rebates to only IEPA, it could have easily included such a provision in the Electric Vehicle Act. It did not, and we may not read such a provision into the Electric Vehicle Act. Under the Electric Vehicle Act, IEPA does not have exclusive authority to issue rebates, so Ameren can include them in its BEP.

¶ 67      Finally, the Attorney General notes the Commission removed similar rebates from the BEP in the ComEd order in that separate proceeding. See *Commonwealth Edison Co.*, Ill. Comm. Comm'n No. 22-0432. There, the Commission found it did not have authority to approve the rebates because they were the same rebates IEPA had the authority to grant. Thus, the Attorney General argues we should grant less deference to the Commission's differing interpretation here because it departed from past practice. However, as previously discussed, we are not faced here with ambiguous statutory language. Under the plain language of the statutes, the Electric Vehicle Act did not grant exclusive authority to IEPA to issue the rebates. We do not need to defer to the agency to reach this decision. Further, Commission orders are not precedent, and the Commission, as a regulatory body, has the " 'power to deal freely with each situation as it comes before it, regardless of how it may have dealt with a similar or even the same situation in a previous

proceeding.' " *Commonwealth Edison Co. v. Illinois Commerce Comm'n*, 2016 IL 118129, ¶ 24 (quoting *Mississippi River Fuel Corp. v. Illinois Commerce Comm'n*, 1 Ill. 2d 509, 513 (1953)).

¶ 68                    D. Application of the Electric Vehicle Act Rate Cap

¶ 69            The Attorney General next contends the Commission erred in its interpretation of the rate cap in section 45(g) of the Electric Vehicle Act. The Attorney General argues the Commission erroneously (1) read the cap to cover only direct spending on electric vehicle infrastructure rather than all spending, (2) applied the cap to the sum of the utility's multiple revenue requirements and not merely the delivery service revenue requirement, and (3) determined bill and delivery credits were not BEP spending.

¶ 70            At issue is the provision of the Electric Vehicle Act providing "[t]he retail rate impact from the development of electric vehicle infrastructure shall not exceed 1% per year of the total annual revenue requirements of the utility." 20 ILCS 627/45(g) (West 2022).

¶ 71            1. *Limiting the Cap to Spending on Electric Vehicle Infrastructure*

¶ 72            The Attorney General argues the inclusion of the word "development" requires the rate cap to encompass all spending contained in a BEP because all of the programs in the BEP "contribute to" or are "intertwined with" the development, implementation, and expansion of electric vehicle infrastructure.

¶ 73            We initially note the Appellate Court, Second District, recently rejected the Attorney General's position. See *Raoul*, 2025 IL App (2d) 230020, ¶ 39. There, the appellate court noted section 45(g) of the Electric Vehicle Act states the rate cap applies to "the development of electric vehicle infrastructure" and agreed with the Commission it did not apply to the total cost of a BEP. *Id.* The court held that to find otherwise would require it to read additional language into the statute, which it would not do. *Id.* The Second District further rejected the argument the

Commission's interpretation led to an absurd result. See *id.* ¶ 40. The Attorney General asks us to disregard the Second District's holding and focuses at length on definitions of the term "development" to suggest that "development" of the "electric vehicle infrastructure" involves all of the BEP spending because additional spending "contributes to" or is "intertwined with" the development of infrastructure. We disagree.

¶ 74     As the Commission and the Second District determined, under the plain language of section 45(g), the cap applies to a narrower definition of "the development of electric vehicle infrastructure" and not the total cost of a BEP. While section 45(g) uses the term "development," that language is plainly limited to development of "electric vehicle infrastructure" and not additional and more amorphous items that might also "contribute to" or be "intertwined with" the development of electric vehicle infrastructure. If the legislature intended the cap to apply broadly, it would have said so.

¶ 75     Further, under the Electric Vehicle Act, BEPs involve provisions such as education programs or rate programs to encourage charging at off-peak times that do not mention or directly relate to electric vehicle infrastructure. See, *e.g.*, 20 ILCS 627/45(b), (d)(x) (West 2022). Instead, such programs apply to programs affecting how existing infrastructure is used. Other than surmising other programs "contribute to" or are "intertwined with" the development of electric vehicle infrastructure, the Attorney General has not pointed a concrete link between all BEP spending and the narrower term "electric vehicle infrastructure." Thus, while we hold the cap does not apply to all BEP spending under the plain language of the Electric Vehicle Act, to the extent any ambiguity is raised by the Attorney General's argument, we also defer to the Commission's interpretation, as the Commission is best suited to determine the spending that applies to the "development of electric vehicle infrastructure."

¶ 76        The Attorney General also argues the Commission's interpretation leads to an absurd result because it effectively leaves no meaningful limit on the BEP's infrastructure spending. We first note we generally need not address whether the interpretation is absurd when the statute is not ambiguous. *Scott*, 2024 IL App (4th) 231305, ¶ 21. Regardless, to the extent an ambiguity may be found here, we note the Electric Vehicle Act encompasses broad and ambitious policy goals. Thus, it does not reflect an intent of the legislature to implement the cap to apply to all BEP spending.

> "[T]he absurd results doctrine merely permits a court to favor an otherwise reasonable construction of the statutory text over a more literal interpretation where the latter would produce a result demonstrably at odds with any conceivable legislative purpose. [Citation.] It does not, however, license a court to simply ignore or rewrite statutory language on the basis that, as written, it produces an undesirable policy result." (Internal quotation marks omitted.) *Id.*

We are not persuaded the Commission's interpretation produces a result demonstrably at odds with any conceivable legislative purpose. As such, the result is not absurd.

¶ 77        Moreover, the Second District also rejected the Attorney General's argument. *Raoul*, 2025 IL App (2d) 230020, ¶ 40. The Second District found the Attorney General's argument minimized the Commission's obligations under the statute to ensure all programs are cost-beneficial. *Id.* (" 'The Commission shall determine if the proposed plan is cost-beneficial and in the public interest.' " (quoting 20 ILCS 627/45(d) (West 2022))). That obligation is reflective of the Commission's duty to also ensure utility rates are just and reasonable. *Id.*; see 220 ILCS 5/9-101 (West 2022). We agree. Accordingly, the Electric Vehicle Act is not rendered devoid of meaningful spending limits by the Commission's interpretation limiting the cap to spending of less

than all BEP spending.

¶ 78                    2. *Application of the Cap to Multiple Revenue Requirements*

¶ 79            The Attorney General next contends the Commission erroneously interpreted section 45(g) to apply the rate cap to the sum of Ameren's multiple revenue requirements and not merely to its delivery service revenue requirement. The Attorney General argues Ameren is a distribution-only utility, resulting in revenue requirements established during general rate cases only for distribution services. The Attorney General recognizes other charges and rates exist, such as riders, adjustments, and pass-through charges, but argues those are established in separate proceedings outside of a utility's general rate case. Thus, the Attorney General sought an interpretation limiting application of the rate cap to only the delivery service revenue requirement. As with the Attorney General's first argument, the Second District has rejected this argument as well. See *Raoul*, 2025 IL App (2d) 230020, ¶¶ 41-43.

¶ 80            At issue is the phrase "total annual revenue requirements" in section 45(g). The Second District held, under the plain language of the Electric Vehicle Act, "total annual revenue requirements" refers to the sum of multiple revenue requirements the utility charges. The court found that, had the General Assembly intended to refer to a narrow, singular "revenue requirement," it could have easily done so but it did not. *Id.* ¶ 42. The court also specifically noted the following:

> "For example, in article IX of the Public Utilities Act, the General Assembly utilizes a more limited utility revenue benchmark in the context of natural gas surcharges for public utilities. There, the General Assembly limited the cumulative amount of increases billed under the surcharge to an annual average of 4% of the utility's 'delivery base rate revenues.' 220 ILCS 5/9-220.3(g) (West 2022). Thus,

the Public Utilities Act demonstrates that if the General Assembly had wanted to limit ComEd's 'total annual revenue requirements' to just 'delivery service revenue requirements,' it knew exactly how to do so." *Id.* The court also rejected the Attorney's General's argument concerning the requirements being established in separate proceedings, stating that, while other revenue may be recovered outside of a utility's rate case, that is not evidence the General Assembly intended for "total annual revenue requirements" in the Electric Vehicle Act to be read as "delivery services revenue requirement." *Id.* ¶ 43. We agree with the Second District's analysis.

¶ 81　　　　Nothing in the Electric Vehicle Act limits the plural "total annual revenue requirements" to the singular "delivery services revenue requirement." Indeed, the inclusion of the word "total" and the use of the plural "requirements" plainly show the opposite.

¶ 82　　　　The Attorney General also argues the Commission's interpretation leads to an absurd result. However, having found the language of section 45(g) is clear and unambiguous, we need not consider that argument. See *id.* ¶ 44. Regardless, we also note that, as discussed in regard to the Attorney General's previous arguments, given the broad and ambitious policy goals of the Electric Vehicle Act, we are not persuaded the Commission's interpretation produces a result demonstrably at odds with any conceivable legislative purpose.

¶ 83　　　　　　　　　3. *Exclusion of Bill and Delivery Credits*

¶ 84　　　　The Attorney General next contends the Commission erred in excluding bill and delivery credits from Ameren's total revenue requirements. The Attorney General argues such credits cannot constitute spending subject to the cap and should not be considered in determining the BEP budget. In doing so the Attorney General takes issue with the Commission's factual finding that, although bill and delivery credits reduce Ameren's service delivery revenue, the

reduction does not add a cost to be collected in its revenue requirement because there is no additional cost to be recovered from customers. The Attorney General submits that finding is in error because Ameren is entitled to recover all of its reasonable costs of service from customers, so it will eventually be able to recoup the bill and delivery credits through its rates.

¶ 85    The Electric Vehicle Act does not specifically address bill and delivery credits and merely states, "[t]he Commission shall consider revenues from electric vehicles in the utility's service territory in evaluating the retail rate impact. The retail rate impact from the development of electric vehicle infrastructure shall not exceed 1% per year of the total annual revenue requirements of the utility." 20 ILCS 627/45(g) (West 2022).

¶ 86    The Commission first found the credits were not applicable because they were not related to the development of electric vehicle infrastructure. Then, addressing the issue in regard to the BEP budget, the Commission noted the testimony of Kilhoffer that the revenue from charging and the bill credits to customers were "two sides to the same coin." Thus, the Commission found, "Although the bill/delivery credits at issue may impact the overall bill for participating customers, those credits are an element of Ameren's overall rate design, and thus a function of the revenues collected from ratepayers rather than an increase in costs." The Commission further found "the bill/delivery credits have no impact on the revenue requirement" and, "although the bill/delivery credits reduce the Company's delivery service revenue, this reduction does not add a cost to be collected in Ameren's revenue requirement, so there is no additional cost to be recovered from customers." Accordingly, the Commission declined to include the bill and delivery credits in the determination of the BEP budget.

¶ 87    Here, we take the findings and conclusions of the Commission on questions of fact as *prima facie* true and consider any rule, regulation, order, or decision of the Commission to be

*prima facie* reasonable. 220 ILCS 5/10-201(d) (West 2022). The Attorney General speculates Ameren will recoup bill and delivery credits through its rates. But Kilhoffer testified the credits are part of the rate design. The Attorney General has not pointed to testimony or facts to convince us all reasonable persons would agree the Commission's finding based on that testimony is erroneous and that the opposite conclusion is evident.

¶ 88          4. *Total Effect of the Commission's Application of Section 45(g)*

¶ 89          We note the Attorney General also argues the cumulative effect of the Commission's application of section 45(g) "thwarts the legislature's intent to balance the need for transportation electrification with controlling the costs of those upgrades for ratepayers." However, as previously discussed, most of our determinations of those issues have been made based on the plain language of the Electric Vehicle Act. Further, as also as previously discussed, the Electric Vehicle Act sets forth broad and ambitious policy goals and contains provisions requiring a determination that the BEP is cost-beneficial before approval. Accordingly, we do not find the cumulative effect of the Commission's interpretation and application of section 45(g) requires reversal.

¶ 90          E. Administrative Authority to Order a Compliance Filing

¶ 91          Finally, the Attorney General contends the Commission abdicated its administrative responsibilities by delegating authority to Ameren when it ordered Ameren to submit a compliance filing. The Attorney General generally frames or analogizes the issue as an abdication of the Commission's ratemaking authority and cites cases applicable to ratemaking. The Attorney General does so to argue the Commission improperly allowed Ameren discretion to set its BEP spending without guidance or restriction and without determining whether that spending was just, reasonable, cost-beneficial, and in the public interest. We disagree.

¶ 92        We first note the Electric Vehicle Act contemplates the approval of a BEP with modifications. See 20 ILCS 627/45(d) (West 2022) ("The Commission shall approve, approve with modifications, or reject the plan within 270 days from the date of filing."). When the Commission ordered modifications, it specifically found the budget should be increased to accommodate the modifications.

¶ 93        The Commission was also specific regarding the modifications. The modifications ordered by the Commission included requirements for Ameren to expand subsidies for certain electric line extensions and account for differences in cost between different electric vehicle chargers. The Commission also adopted a proposal that customers be allowed to use electric line extension funds for electrification expenses "on the customer side of the meter" to the extent the budget allowed, the BEP budget remained under the rate cap, and the BEP remained cost-beneficial. The Commission further ordered expanded rebates and ordered Ameren to propose a budget for programs advanced by other parties. In its order, the Commission referred to the positions of the parties on various issues and noted the amount of spending available under the cap. The Commission then ordered Ameren to work with Commission staff and intervenors when formulating the compliance filing to ensure it complied with the final order.

¶ 94        Here, given (1) the authority of the Commission to enter an order with modifications, (2) the details it provided regarding the modifications it ordered, (3) the requirement of Ameren to work with staff and intervenors, and (4) the requirement of a compliance filing to ensure the modifications were incorporated into the already approved as modified BEP, we do not agree Ameren was given discretion to set its budget without guidance or restriction.

¶ 95        We also disagree with the Attorney General's position that the Commission abdicated its role in determining whether the BEP was just and reasonable, cost-effective, and in

the public interest. In its overall findings, the Commission specifically stated the proposed BEP as modified (1) was reasonable, (2) met the statutory requirements and policy goals of the Electric Vehicle Act, (3) was cost-beneficial, and (4) was in the public interest. The order itself noted the BEP could be modified only to the extent it remained cost-beneficial. As previously noted, the Commission required Ameren to share a draft compliance BEP with Commission staff and the intervenors, who would provide feedback regarding whether the compliance BEP accurately reflected the Commission's final order. Then, Ameren was required to submit a filing of compliance. Under those provisions, Ameren could not unilaterally set its BEP budget. Indeed, when Ameren submitted its compliance filing as ordered, the Attorney General then challenged that filing, arguing the budget was no longer cost-beneficial; the Commission considered the issue and denied the Attorney General's challenge. Thus, the Commission fully exercised its authority over the matter and did not abdicate its role in setting the BEP budget to Ameren.

¶ 96                                     III. CONCLUSION

¶ 97          For the reasons stated, we affirm the trial court's judgment.

¶ 98          Affirmed.

*People ex rel. Raoul v. Illinois Commerce Comm'n*, 2025 IL App (4th) 230491

| | |
|---|---|
| **Decision Under Review:** | Petition for review of order of Illinois Commerce Commission, Nos. 22-0431, 22-0443. |

| | |
|---|---|
| **Attorneys for Appellant:** | Kwame Raoul, Attorney General, of Chicago (Jane Elinor Notz, Solicitor General, and Benjamin F. Jacobson, Assistant Attorney General, of counsel), for appellant. |

| | |
|---|---|
| **Attorneys for Appellee:** | Brian J. Dodds, Robert W. Funk, and Thomas R. Stanton, Special Assistant Attorneys General, of Chicago, for appellee Illinois Commerce Commission. |
| | Albert D. Sturtevant, Mark W. DeMonte, and Christine Prorok, of Whitt Sturtevant LLP, of Chicago, for appellee Ameren Illinois Company. |
| | William M. Shay, of Westervelt, Johnson, Nicoll & Keller, LLC, of Peoria, and Robert A. Weinstock, of Northwestern Pritzker School of Law Environmental Advocacy Center, of Chicago, for appellees Environmental Defense Fund, Sierra Club, and Respiratory Health Association. |
| | No brief filed for other appellees. |