2025 IL App (3d) 240093

Opinion filed December 1, 2025

_____

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2025

| | | |
|---|---|---|
| NORTHERN ILLINOIS GAS COMPANY, d/b/a Nicor Gas Company, | ) ) ) | Petition for Review of Orders of the Illinois Commerce Commission, |
| Petitioner, | ) ) ) | Appeal No. 3-24-0093 ICC Docket # 23-0066 |
| v. | ) ) | |
| THE ILLINOIS COMMERCE COMMISSION and THE PEOPLE *ex rel.* KWAME RAOUL, Attorney General of the State of Illinois, | ) ) ) ) ) | |
| Respondents. | ) ) | |

_____

JUSTICE HETTEL delivered the judgment of the court, with opinion.
Justices Peterson and Bertani concurred in the judgment and opinion.

_____

**OPINION**

¶ 1        Petitioner, Northern Illinois Gas Company, doing business as Nicor Gas Company (Nicor), appeals from a November 16, 2023, decision issued by the Illinois Commerce Commission (Commission) in Nicor's rate case. In its decision, the Commission adopted an imputed capital structure for Nicor, disallowed portions of Nicor's proposed pipeline investment costs, and required Nicor to file a long-term gas infrastructure plan. For the following reasons, we affirm in part and vacate in part.

¶ 2                           I. BACKGROUND

¶ 3                   A. General Background and Procedural History

¶ 4       Nicor is a public utility that distributes natural gas to approximately 2.3 million customers located throughout northern Illinois and operates a distribution system that is approximately 34,000 miles long. As a public utility, Nicor is governed by the Public Utilities Act (Act) (220 ILCS 5/1-101 *et seq.* (West 2022)) and regulated by the Commission. See *id.* §§ 3-105, 4-101 (defining the term "public utility" and stating that the Commission has "general supervision" of all public utilities).

¶ 5       A public utility is entitled to recover certain operating costs through the rates that it charges its customers. *Citizens Utility Board v. Illinois Commerce Comm'n*, 166 Ill. 2d 111, 121 (1995). The Commission is responsible for setting the rates charged by a utility. *United Cities Gas Co. v. Illinois Commerce Comm'n*, 163 Ill. 2d 1, 11 (1994). Generally, a utility seeking a rate increase must file new schedules or supplements with the Commission that indicate the proposed changes to be made in the schedule or schedules already in place, as well as the time when the proposed changes would take effect. 220 ILCS 5/9-201(a) (West 2022). "When a utility files a request for a rate increase in the form of a new tariff schedule, the Commission has the authority upon complaint or its own initiative to hear evidence, hold hearings and determine the propriety of the requested increase." *Business & Professional People for the Public Interest v. Illinois Commerce Comm'n*, 146 Ill. 2d 175, 195 (1991).

¶ 6       On January 3, 2023, Nicor filed tariff sheets with the Commission in which it proposed "a general increase in rates" effective February 17, 2023. Starting on July 18, 2023, the Commission conducted an evidentiary hearing, during which written testimony and exhibits were admitted into the record. Staff of the Commission (Staff) participated in the proceedings, and the Office of the

Illinois Attorney General (Attorney General) filed an appearance. Additionally, two groups of advocates filed petitions to intervene in the proceedings. The first of these groups included Retail Energy Supply Association; Nucor Steel Kankakee, Inc.; Local Union No. 19 International Brotherhood of Electrical Workers, AFL-CIO; Walmart Inc.; the Environmental Law & Policy Center; the Environmental Defense Fund; the Natural Resources Defense Council; and the Illinois State Public Interest Research Group, Inc. (collectively, "Public Interest Organizations"). The second group included ExxonMobil Power & Gas Services, Inc., as a member of the Illinois Industrial Energy Consumers; the Citizens Utility Board; and the Community Development Corporation of Pembroke-Hopkins Park (collectively, "Ratepayer Advocates").

¶ 7        On November 16, 2023, the Commission issued its order in which it rejected parts of Nicor's proposed rate increase (Order). Nicor subsequently filed a petition for rehearing, which the Commission denied.

¶ 8                            B. Nicor's Proposed Rate Increase

¶ 9                              i. Nicor's Capital Structure

¶ 10       A public utility may charge rates that allow it to earn a return on the amount of its invested capital. *People ex rel. Madigan v. Illinois Commerce Comm'n*, 2011 IL App (1st) 100654, ¶ 76 (citing *Citizens Utility Co. of Illinois v. Illinois Commerce Comm'n*, 124 Ill. 2d 195, 200-01 (1988)). The amount of a utility's return is dependent on its capital structure. See *Citizens Utility Board v. Illinois Commerce Comm'n*, 276 Ill. App. 3d 730, 743-46 (1995) (explaining the costs associated with different forms of capital and how a utility's capital structure impacts the amount that it recovers in revenue). A utility's capital structure typically consists of short-term debt, long-term debt, and equity. See *Ameren Illinois Co. v. Illinois Commerce Comm'n*, 2013 IL App (4th) 121008, ¶ 22. "Generally, equity is a more expensive form of capital than debt." *Illinois Bell*

3

*Telephone Co. v. Illinois Commerce Comm'n*, 283 Ill. App. 3d 188, 204 (1996). "Therefore, the more equity in a utility's capital structure, the higher the [rate of return] must be to cover the cost of capital." *Id.*

¶ 11      When calculating the rates that a public utility may charge its customers, the Commission considers the company's operating costs, rate base, and allowed rate of return. *Citizens Utility Co.*, 124 Ill. 2d at 200. "Recovery of the utility's operating costs and the return on its rate base is known as the utility's annual revenue requirement." *Commonwealth Edison Co. v. Illinois Commerce Comm'n*, 405 Ill. App. 3d 389, 394 (2010). "Generally speaking, a utility determines its revenue requirement by adding operating costs to invested capital multiplied by the rate of return." *Id.* "The components of the revenue requirement have frequently been expressed in the formula 'R (revenue requirement) = C (operating costs) + Ir (invested capital or rate base times rate of return on capital).' " *Business & Professional People*, 146 Ill. 2d at 195.

¶ 12                      1. *Capital Structure Proposed by Nicor*

¶ 13      Nicor proposed increased rates that would yield a 7.49% rate of return on its capital investments. To support its proposal, Nicor submitted testimony by Gregory MacLeod, the Finance Director and Assistant Treasurer for Nicor's parent company, Southern Company (Southern). MacLeod explained that the rate of return that Nicor sought on its capital investments was based on a "Test Year" capital structure that consisted of 54.520% of common equity, 42.437% of long-term debt, and 3.043% of short-term debt. MacLeod further explained that the Test Year capital structure was "neither hypothetical nor derived for ratemaking purposes only," but was, instead, "consistent" with Nicor's actual capital structure, which had remained the same for "several years" and the Commission had approved in the past. According to MacLeod, Southern owned all Nicor's

common equity, and Nicor had no authority to issue common equity to an entity other than Southern.

¶ 14        MacLeod testified that the Test Year capital structure was reasonable in that it would permit Nicor to maintain its financial strength and access to the capital markets, rendered Nicor financially resilient enough to respond to the risks that the company expected to face, was comparable to the capital structures of other "financially sound" local gas distribution companies, and was based on the same goals and capital-planning approaches that had underlain Nicor's past capital structures that the Commission had approved. As to Nicor's financial resilience, MacLeod recounted that, in February 2021, Nicor had incurred "extraordinary and unexpected costs" to service its customers during Winter Storm Uri, an extreme arctic weather event that lasted days and constrained the gas supply during a time of high demand, causing the cost of gas to increase. MacLeod explained that Nicor's short-term debt and strong credit profile benefited customers by, for example, enabling the company to quickly and efficiently fund the increased costs of its gas services during Winter Storm Uri and to amortize its recovery of the costs by only gradually increasing the customers' rates over an extended period of time. MacLeod added that Nicor was able to perform these actions "all while avoiding potential credit downgrades from the rating agencies."

¶ 15        John Quackenbush, a former utility regulator and advisor to the Commission, testified that the capital structure of a utility is important to its investors. Quackenbush explained that investors expect a return on their investment that is proportional to the risk and that an important type of risk is regulatory risk, which is the risk that certain actions—such as changes in the law or the imposition of regulations—would materially impact the utility by increasing operating costs, decreasing the "attractiveness" of an investment, or changing the competitive landscape. Quackenbush further explained that investors consider a utility's capital structure when assessing

5

risk because they know that the Commission considers the capital structure when authorizing the rate of return on a utility's capital investments.

¶ 16    Next, Quackenbush testified that investors receive information regarding regulatory risks from credit rating agencies, whose role is to "provide debt capital market[***] participants with an independent, objective, and forward-looking opinion of creditworthiness [of a debt security]." Quackenbush stated that credit rating agencies indicate a debt security's creditworthiness by assigning the security a letter that corresponds with the relative risk that the debt issuer will default. He also further elaborated on the grade rating system by adding the following:

> "Letters closer to the front of the alphabet indicate higher levels of creditworthiness and a lower probability of default. When a change in credit quality is perceived, the rating agencies will change the ratings up or down, thereby upgrading or downgrading the debt. The rating agencies' investment grade ratings are 'AAA' or 'Aaa," followed by 'AA' or 'Aa,' then 'A,' then 'BBB' or 'Baa.' Every rating beneath 'BBB' or 'Baa' is considered below investment grade, junk, speculative, and high yield, with the associated debt carrying significantly higher probability of default. The rating agencies also use a '+' or '1' designation to indicate a rating in the high portion of a rating category, and '-' or '3' designation to indicate a rating in the low portion of a rating category."

Quackenbush pointed out that numerous credit rating agencies had assigned Nicor credit ratings of A2, A-, and A, with the "2" in A2 denoting creditworthiness in the middle of the A category. He also pointed out that one of these credit rating agencies, Moody's Investor Service (Moody's), had characterized the Illinois regulatory framework as being "credit supportive."

¶ 17                          2. *Capital Structure Proposed by Ratepayer Advocates*

¶ 18          The Ratepayer Advocates recommended that Nicor's capital structure consist of 52.0% of common equity, rather than the 54.520% that the company proposed. Michael Gorman—a public utility regulation consultant and a Managing Principal with an energy, economic, and regulatory consulting firm—testified in support of the Ratepayer Advocates that, although he agreed with MacLeod that a utility's capital structure "should be adequate to support its financial integrity, credit standing and access to capital, it should also do so at just and reasonable rates to customers." Gorman explained that, "[h]ence, there should be a demonstration that the ratemaking capital structure is no more expensive than necessary to support [Nicor's] financial integrity and credit standing objectives."

¶ 19          Gorman further testified that MacLeod had failed to demonstrate that Nicor's proposed capital structure was as cost-effective as possible in that MacLeod had not provided evidence of whether a capital structure with less common equity and cost than that proposed by Nicor would still achieve Nicor's financial goals. Gorman assessed the reasonableness of Nicor's proposed capital structure by reviewing the utility's credit metric projections, a comparison to industry credit metric estimates, and the capital structures of other companies. Gorman also considered numerous factors, such as that Moody's and Standard & Poor's (S&P) had stable credit outlooks for Nicor, that Illinois's regulatory environment was supportive of Nicor's credit ratings, and that Nicor had a "sizable" customer base, which, in turn, suggested that Nicor's existing investment grade bond rating would still be supported if the utility's capital structure were to contain less common equity. Gorman therefore concluded that Nicor's proposed capital structure "contain[ed] more equity than necessary" and was, thus, "more expensive than necessary."

7

¶ 20    In surrebuttal, MacLeod testified that Gorman "seem[ed] shortsightedly focused only on the cost difference between differing sources of capital" and that Gorman had "ignore[d] the potential negative customer impacts of adding more financial and business risk to [Nicor]." MacLeod explained that "[f]ocusing exclusively on the near-term rate of return ignores the customer protection that a strong credit rating provides to customers." He further explained that if Nicor were to have a less resilient credit profile, then the utility would have a weakened "ability to navigate volatile market conditions and provide necessary liquidity in times of financial and operational stresses," which would, in turn, "result in increased costs to customers over the longer-term as [Nicor's] borrowing rates increase through a combination of lower credit ratings and an increasing interest rate environment."

¶ 21                              3. *Capital Structure Proposed by Staff*

¶ 22    Staff recommended that Nicor's capital structure consists of only 50% common equity, 46.96% long-term debt, and 3.04% short-term debt. In support of Staff's recommendation, Sheena Kight-Garlisch, a Senior Financial Analyst for the Commission, testified that an "optimal" capital structure for a utility would both "minimize the cost of capital and maintain [the] utility's financial strength" and that the Commission should not determine a utility's overall rate of return based on its actual capital structure "if that capital structure adversely affects the overall cost of capital."

¶ 23    Kight-Garlisch assessed whether the Commission should have used Nicor's proposed capital structure to set the utility's overall rate of return. During her assessment, Kight-Garlisch found that Nicor's proposed capital structure contained "a significantly higher percentage of common equity" than the two sample groups of gas utilities upon which she had relied and which each contained an average of 42.51% and 41.56% of common equity, respectively. Kight-Garlisch further found that Nicor's proposed common equity ratio was also higher than the average equity

8

ratio of Southern, which was 37.41%. Kight-Garlisch stated that, although a higher percentage of common equity implies lower risk and Southern was a "riskier" company than Nicor, Nicor's proposed equity ratio was "much higher" than Southern's and the proposed capital structure contained "more common equity than needed" to support its financial strength and maintain its credit ratings. Kight-Garlisch thus concluded that the Commission should not use Nicor's proposed capital structure to set the utility's overall rate of return.

¶ 24        In rebuttal, Wendell Dallas, the President and Chief Executive Officer of Nicor, testified that, in the utility's "most recent" rate case in 2021, Kight-Garlisch had "supported the use of [Nicor's] actual capital structure with some modest adjustments, and testified that an equity ratio of 54.459% [was] 'consistent with the common equity ratios of other similar companies in the gas distribution industry' and 'was commensurate with a strong, but not excessive, degree of financial strength.' " Dallas stated that Kight-Garlisch had also found that Nicor's common equity ratio of 54.459% was consistent with the average common equity ratio of her sample group, which was 47.26%.

¶ 25        Dallas also testified that, in a 2018 rate case, Staff witness Rochelle Phipps concluded that a common equity ratio of 54.41% "was 'consistent with the common equity ratios of other companies in the gas distribution industry' where the mean common equity ratio for the gas distribution industry was 46.98% ***." Additionally, Dallas testified that, in a 2017 rate case, Phipps separately found that a common equity ratio of 54.206% " 'compared favorably with other companies in the gas distribution industry' where the mean common equity ratio for the gas industry was 51.07% ***."

9

¶ 26                              4. *The Commission's Findings*

¶ 27        In its order, the Commission articulated that "[t]he optimal capital structure minimizes the cost of capital while maintaining a utility's financial strength" and that the central question in this case was "whether [Nicor's] proposal [was] stronger than necessary." The Commission then found that Staff and the Ratepayer Advocates had successfully shown that Nicor could maintain its credit rating with a common equity ratio of 50%; that Nicor's proposed common equity ratio was "much higher" than those of the sample gas distributors and Southern, which were all riskier entities; and that Nicor's proposed common equity ratio was "significantly greater than those typically approved by commissions around the country for the past decade."

¶ 28        The Commission further found that, conversely, Nicor had not shown that its proposed common equity ratio was needed to support its financial integrity. The Commission remarked that "[i]t appear[ed] that [Nicor's] proposed equity ratio [was] high due to its association with non-regulated affiliates, thus requiring ratepayers to pay higher costs than warranted ***." Ultimately, the Commission adopted the imputed capital structure proposed by Staff, which consisted of 50% common equity, 46.96% long-term debt, and 3.04% short-term debt.

¶ 29                              ii. Nicor's Pipeline Investments

¶ 30        A natural gas utility is required by law to "refurbish, rebuild, modernize, and expand" the infrastructure of its natural gas system to ensure that it is providing "safe, reliable, and affordable service" to its customers. 220 ILCS 5/5-111 (West 2022). A public utility may also recover, through the rates that it charges its customers, "the value of such investment which is both prudently incurred and used and useful in providing service to public utility customers." *Id.* § 9-211.

¶ 31        Nicor uses natural gas pipelines to deliver gas from interstate pipelines, transport gas from storage fields, move gas within its service territory, and deliver gas to the distribution mains and

10

pipes to serve customers. In this case, Nicor sought to recover for certain investments that it made to ensure that its natural gas system was safe and reliable.

¶ 32                                    1. *Distribution Investments*

¶ 33        Typically, there is a delay between when a natural gas utility invests in its infrastructure and when it can begin recovering the costs of its investments through a rate case. During the delay, the investors in the utility must finance the costs, which tends to discourage further investment.

¶ 34        In 2013, to reduce the delay in which natural gas utilities could recover their investment costs, the General Assembly enacted section 9-220.3 of the Act, which allowed a natural gas utility to file a tariff for surcharges that would adjust the utility's rates and charges to allow it to recover its investment costs in "qualifying infrastructure plant" (QIP), independent of other matters related to the utility's revenue requirement. *Id.* § 9-220.3; see *Citizens Utility Board*, 166 Ill. 2d at 133. This cost-recovery method is referred to as a "rider." See *Citizens Utility Board*, 166 Ill. 2d at 133. Section 9-220.3 of the Act was repealed on December 31, 2023, after which Nicor could no longer recover its investment costs by using a rider. 220 ILCS 5/9-220.3 (West 2022).

¶ 35                    a. *Nicor's Proposed Recovery of Distribution Investment Costs*

¶ 36        Nicor sought to recover $149.5 million in distribution investment costs that it could have recovered through a rider, prior to the repeal of section 9-220.3 of the Act. To support Nicor's position, Patrick Whiteside, the senior vice president of operations for Nicor, testified that, to ensure that its gas service was safe and reliable, Nicor had regularly invested in its storage, transmission, and distribution systems. Whiteside explained that Nicor's investments in these systems included "main replacement, system regulator station installations and replacements ***, rehabilitation and replacement of facilities critical to operating the [c]ompany's eight storage

11

fields, installation of new main and services [for] new customers, and gas main and service replacement resulting from public improvements as required by various governmental entities."

¶ 37         Whiteside detailed the following regarding Nicor's method of deciding which distribution investment projects to prioritize:

> "Nicor [***] takes a systematic approach to prioritizing investments eligible for recovery under [r]ider QIP. Each project category carries a unique set of characteristics that are evaluated for risks and other factors, including, but not limited to, safety, reliability, obsolescence, age, and asset integrity. This analysis includes data from Subject Matter Experts, and the newest requirements for federal pipeline safety and inspections ***. These prioritizations are conducted on both a holistic basis in determining overall investment resources and within each qualifying investment category to determine the optimal deployment of resources. The [c]ompany's approach also includes consideration of factors specified in [s]ection 9-220.3 of the Act."

¶ 38         Additionally, Whiteside testified that, after section 9-220.3 of the Act was enacted, Nicor completed numerous projects, such as working at an accelerated rate to replace the remaining cast iron main and known copper services in its systems, which the company fully accomplished in 2018 and 2019. Whiteside explained that, despite this completed work, Nicor had determined that its gas distribution system still contained future needs, a "significant amount" of which entailed projects with costs that the company could recover through a rider. Whiteside stated that, in light of the then impending repeal of section 9-220.3 of the Act, however, Nicor planned to "roll[***] its QIP investments into rate base as of the end of 2023 *** and recover capital investments that would have been eligible for recovery under [r]ider QIP through base rates in 2024."

12

¶ 39      Whiteside more specifically explained that some of the projects designed to address Nicor's future needs included the replacement of "other" qualifying vintage material, which, in turn, included approximately 1,624 miles of mechanically coupled steel gas mains that were "known to present enhanced safety risks and [had] been identified as the cause of known industry incidents and failures." Whiteside stated that this infrastructure "need[ed] to be addressed in a timely manner to decrease the probability of a future incident or failure." He thus concluded that, although Nicor had not decreased its infrastructure replacement rate, the Commission should nevertheless approve the company's proposed recovery of its distribution costs as prudent and reasonable.

¶ 40           b. *Attorney General's Proposed Recovery of Distribution Investment Costs*

¶ 41      The Attorney General recommended that the Commission disallow 33%, or $55.1 million, of Nicor's proposed distribution investment costs on the grounds that the costs were unreasonable, lacked sufficient identification and justification, and lacked evidentiary support. Rod Walker, Chief Executive Officer and President of a management consultancy and technical advisory firm, analyzed Nicor's efforts to ensure the safety and reliability of its infrastructure. Walker noted that Nicor had approximately 33,616 miles of mains and 2,054,463 services in its gas distribution system, which was the largest in Illinois. Walker further noted that, prior to the enactment of section 9-220.3 of the Act, there were 488 miles of leak-prone pipe (LPP) mains and 57,588 LPP services in Nicor's gas distribution system, but that Nicor had already reduced this inventory to 83 miles of LPP mains and 6,645 LPP services by the end of 2022, which yielded an 83% reduction in LPP mains and 88.5% reduction in LPP services.

¶ 42      Walker concluded that, "[g]iven the nearly complete replacement of LPP main and services in the Nicor system as well as other improvements to the system," it was no longer warranted for Nicor to work at an accelerated pace to improve its infrastructure. Walker observed, however, that,

13

even though Nicor's accelerated pace had no longer been warranted, the amount of infrastructure that the company replaced in 2024 declined by only approximately 0.5% between 2023 and 2024 and service replacement costs were forecasted to increase by approximately 30% in 2024. Walker explained that, although it appeared that Nicor had been devoting its continued accelerated pace to "other" main and service replacements, the company had not defined such replacements. Based on his analysis, Walker concluded that Nicor planned to continue working at an accelerated rate to improve its infrastructure, even after section 9-220.3 of the Act was repealed and the accelerated rate was no longer justified.

¶ 43    Separately, David Dismukes, a consulting economist with Acadian Consulting Group, testified that section 9-220.3 of the Act "was premised on a desire that the mechanism be used to facilitate the accelerated replacement of aging infrastructure assets to which there was a perceived growing safety or reliability concern," but that, according to Nicor, it had already replaced a "significant" amount of its aging infrastructure assets. Dismukes further testified that, thus, Nicor would still be able to maintain a safe and reliable gas distribution system if it were to reduce the amount that it invested to improve the system.

¶ 44    Additionally, Catherine Elder, an employee of Aspen Environmental Group, testified that the evidence offered by Nicor indicated that the company's "spending on other 'qualifying vintage materials' [was] merely taking the place of prior QIP spending on copper services, cast iron main and services, [and] bare steel mains and services." Elder explained, however, that this showing by Nicor "downplay[ed]" the fact that Nicor had "dramatically increased" its investment in replacing other qualifying vintage material. Further, Elder concluded that Nicor had failed to justify the amount that it had been investing to replace such qualifying vintage material.

14

¶ 45                                          c. *The Commission's Findings*

¶ 46          In its Order, the Commission acknowledged Nicor's statutory requirement to show that its investments were prudently made and its argument that its distribution investments helped ensure the safety and reliability of the company's infrastructure. However, the Commission clarified that the question before it was "not whether pipeline replacements generally improve[d] safety and reliability, but what types of pipes [were] to be replaced, to what degree safety and reliability [were] affected, and importantly, at what cost." The Commission then found that Nicor had failed to show that the other qualifying vintage material posed similar risks to LPP material, that replacement of the qualifying vintage material was required in place of other methods of redress, or that the company needed to replace the other qualifying vintage material at the same rate as it had the LPP material. The Commission also found that Nicor's justifications for its distribution investments lacked meaningful definitions and "concrete" evidentiary support. On these bases, the Commission adopted the Attorney General's recommendation to disallow $55.1 million of Nicor's proposed distribution investment costs.

¶ 47                                          2. *MAOP Investments*

¶ 48          Effective July 1, 2020, section 192.624(b) of the Code of Federal Regulations (49 C.F.R. § 192.624(b) (2022)) required all gas utilities to develop and document procedures concerning the maximum allowable operating pressure (MAOP) of their gas transmission pipelines (MAOP Rule). Specifically, the MAOP Rule required gas utilities to reconfirm the MAOP of 50% of their applicable pipelines by July 3, 2028, and 100% of their applicable pipelines by July 2, 2035. *Id.* The six methods that a gas utility was permitted to use to reconfirm MAOP were: (1) pressure testing, (2) pressure reduction, (3) engineering critical assessment, (4) pipe replacement,

15

(5) pressure reduction for pipeline segments with small potential impact radius, and (6) alternative technology (reconfirmation methods). *Id.* § 192.624(c).

¶ 49         a. *Nicor's Proposed Recovery of MAOP Investment Costs*

¶ 50   Nicor sought to recover $57.7 million in MAOP reconfirmation investment costs and submitted a 15-year plan to complete MAOP reconfirmation. Whiteside testified that Nicor had "a comprehensive process to analyze pipeline segments requiring reconfirmation to determine appropriate actions to achieve reconfirmation." Whiteside explained that, as part of this process, Nicor performed a records research and review to determine compliance with "49 CFR Part 192 regulations," identified pipeline segments that required MAOP reconfirmation, and then selected one of the six reconfirmation methods to address the pipelines that required MAOP reconfirmation. Whiteside also added that "[f]urther risk and prioritization criteria" was based on factors such as Nicor's ability to reduce pressure, Nicor's ability to take the pipeline segment out of service, impact to customers, and financial impact. According to Whiteside, Nicor was on course to achieve 50% compliance with the MAOP Rule by 2023, five years in advance of the 2028 compliance deadline.

¶ 51        b. *The Attorney General's Proposed Recovery of MAOP Investment Costs*

¶ 52   The Attorney General recommended that the Commission deny 75%, or $43.3 million, of Nicor's proposed MAOP reconfirmation investment costs. Walker testified that Nicor had identified approximately 368 miles of pipeline in its gas transmission system that were subject to the MAOP Rule, and that, after initiating a records review, the company had determined that 67 miles of pipeline required remediation. Walker explained that Nicor had not completed its records review and that he estimated that there would be a total of 93 miles of pipeline that would require remediation. Walker stated that Nicor had indicated that, of the six reconfirmation methods, the

16

company intended to make pressure testing and replacement its two primary means of MAOP reconfirmation.

¶ 53    Walker expressed that he was concerned about the pace of Nicor's MAOP reconfirmation plan. He noted that, when Nicor was asked its reasons for frontloading its MAOP reconfirmation work, the company stated that it did not have a time-based plan for replacement and refused to state the year in which it would achieve 100% compliance with the MAOP Rule. Walker thus concluded that Nicor had frontloaded its MAOP reconfirmation costs without justification.

¶ 54    Walker testified that he was also concerned that Nicor was replacing too many of its pipelines that required remediation, rather than using one of the other reconfirmation methods. He explained that the Pipeline and Hazardous Materials Safety Administration (PHMSA) had estimated that only 300 miles, or 0.18%, of the 168,000 miles of onshore transmission pipelines installed prior to the 1970 requirement of hydrostatic pressure testing would need to be replaced to conform with the MAOP Rule. Walker further explained that if this ratio were applied to Nicor's gas transmission system, then the company would be expected to replace less than one quarter of one mile of its pipeline, which it had exceeded. Walker thus ultimately recommended that the Commission disallow $43.3 million of Nicor's proposed MAOP reconfirmation investment costs.

¶ 55    Bradley Cebulko, senior manager at Strategen Consulting and a witness for the Public Interest Organizations, testified that Nicor had not demonstrated that its MAOP reconfirmation investment costs were prudent, partly in that "the [c]ompany did not appear to have evaluated all six MAOP reconfirmation methods *** and the [c]ompany mistakenly claim[ed] that the lack of records prevent[ed] reconfirmation through means other than pipeline replacement." Cebulko stated that Nicor also did "not appear to have instituted an Engineering Critical Assessment (ECA) process, one of the six MAOP reconfirmation methods, suggesting that the [c]ompany's existing

17

methodology may not be comprehensive." Cebulko explained that the fact that Nicor did not have an ECA process also increased the risk that the company was reconfirming pipeline segments using less cost-effective measures such as replacement.

¶ 56                                   c. *The Commission's Findings*

¶ 57        In its order, the Commission found that the Attorney General had presented sufficient evidence to show that Nicor might have been frontloading its MAOP reconfirmation work for the 2035 compliance period. The Commission separately noted that Nicor had provided "no basis for the 2024 budget increase other than the number of miles it believe[d] still need[ed] remediation" and that Nicor had already achieved 50% compliance ahead of the 2028 MAOP reconfirmation deadline and had "nearly 12 years" to achieve full compliance with the MAOP Rule. The Commission then stated that, because "Nicor *** [was] well ahead of its MAOP reconfirmation and [had] not sufficiently demonstrated the reasonableness of the 2024 MAOP budget, including identifying specific projects and scope of work, the Commission believe[d] a pause was necessary until the Company [had] properly planned and justified its MAOP costs."

¶ 58        Based on its findings, the Commission adopted the Attorney General's recommendation to disallow $43.3 million of Nicor's MAOP reconfirmation investment costs. The Commission also directed Nicor to submit an MAOP and Records Compliance Plan (Compliance Plan) to assist the Commission in assessing whether Nicor was "fairly" considering its options regarding MAOP reconfirmation work.

¶ 59                              3. *Transmission Pipeline Investments*

¶ 60        Nicor's gas distribution system contains intrastate transmission pipelines that transport gas from interstate pipelines to the company's delivery points. At the time when it filed its January 3, 2023, tariff sheets, Nicor planned to complete eight future projects on four of its transmission lines.

18

Each project entailed the replacement of pipes between 20 inches and 36 inches in diameter along segments ranging from 1 mile to 19.2 miles long. The parties contested issues regarding four out of Nicor's eight planned projects (contested projects).

¶ 61    a. *Nicor's Proposed Recovery of Transmission Pipeline Investment Costs*

¶ 62    Nicor sought to recover approximately $394.5 million in transmission pipeline investment costs related to its eight future projects. Whiteside testified that three out of Nicor's four contested projects were each a phase of the company's broader Crawford Line project, which involved the replacement of three miles of a 20-inch pipeline near Crawford Avenue in the southern suburbs of Chicago. Whiteside explained the following regarding Nicor's reasons for deciding to replace the pipeline involved in the Crawford Line project:

"Crawford is a vintage line that was installed in 1950. This line has other limiting factors such as the inability to reduce pressure, the inability to take the pipeline out of service, the inability to run in-line inspections, and missing material property data and pressure test records. This line runs through a developed area primarily down the middle of major roadways with shallow depth of cover. It is not piggable and relies on costly direct assessment techniques for integrity management. It is common for third party utilities to encroach upon and be in contact with the line. With mechanical damage commonly found on this line during direct assessment digs and the densely populated area this line is in, risk was a major factor in deciding to replace the line. Given the age, condition, and limitations on this line, the only other alternative was to do nothing which was not an acceptable alternative."

Whiteside also explained that Nicor's decision to replace the pipeline in the Crawford Line project was further motivated by the fact the company was obligated to consider the pipeline "to be of the

19

lowest yield strength because [Nicor] did not have the records to verify this information." Whiteside thus characterized Nicor's decision to replace the pipeline in the Crawford Line project as "prudent."

¶ 63 The fourth of the contested projects was the Bensenville project, which involved 0.8 miles of a 20-inch pipeline in Bensenville that Nicor sought to replace because it conflicted with certain storm sewer installation that was associated with a separate tollway relocation project. Whiteside testified that, as was similarly so with respect to the Crawford Line project, Nicor needed to consider the pipeline in the Bensenville project to "be of the lowest yield strength because the [c]ompany [did] not have the records to verify this information." Whiteside explained that applicable code required the performance of additional integrity inspections of the pipeline in the Bensenville project and that, because this pipeline, which ran through a populated area, was of unknown yield strength, it was at high risk for potential failure. Whiteside also explained that the Bensenville project was prioritized "based on the tollway relocation" and stated that replacement of the pipeline would allow for the establishment of records and MAOP.

¶ 64 b. *The Attorney General's Proposed Recovery of Transmission Pipeline Investment Costs*

¶ 65 The Attorney General recommended that the Commission disallow $28.4 million of Nicor's proposed transmission pipeline investment costs for the four contested projects. In support of this recommendation, Walker testified that he performed an industry-standard cost analysis of the Crawford Line and Bensenville projects. He also explained the following regarding the methodology that he employed in conducting this industry-standard cost analysis:

"The industry-standard method employed utilizes the concept of financial measurement based on a pipeline size-relative constant developed using a statistically significant number of similarly situated pipeline projects. The constant is a multiplier,

20

developed using a regression analysis that takes into account significant pipeline data and statistics such as physical measurements and regional cost differences to produce a cost-determination constant based upon Diameter-Inches-Miles (Dia-inch-Miles). This constant can then receive a regional cost amplification multiplier. Further, accommodations for urban versus rural siting, and cost escalation to coincide value and time can also be appropriate. Once a cost-determination constant has been established, comparative benchmarking of Nicor's proposed transmission pipeline costs and budgets can be made.

Utilizing the nominal diameter of the pipeline and the pipeline's length as multipliers to the [dollar] per Dia-in-Mile cost-determination constant results in a base cost budget for the pipeline project. Following the determination of the base cost budget, the application of regional cost and financial cost alignment amplification multiples can be made that result in a reasonable estimate of the natural gas pipeline cost that is then used to compare with the proposed cost budget ***."

¶ 66    Walker testified that, upon conducting the industry-standard cost analysis, he calculated a benchmark of $262,701 per Dia-inch-Mile. Walker also testified that he concluded that the four contested projects had a per Dia-inch-Mile cost that was "significantly higher" than the calculated benchmark and that Nicor's proposed transmission pipeline investment costs were unreasonable.

¶ 67    In rebuttal, Whiteside testified that Walker's industry-standard cost analysis was faulty in numerous respects. Whiteside pointed out that, first, Walker had made "a fundamental mistake in the selection of the projects that he call[ed] 'similarly situated projects.' " Whiteside explained that "[a]bout the only thing in common" between the contested projects and those that Walker had deemed similarly situated were the pipeline diameters. Whiteside also asserted that the contested projects were shorter than those to which Walker had compared them and that Walker had failed

21

to account for the " 'economies of scale for a large project' versus the high degree of friction costs *** for a small project.' " Additionally, Whiteside pointed out that the contested projects were located in urban areas, which encompass geographical and other challenges that substantially increase costs, unlike the rural projects upon which Walker had relied to establish his benchmark. Whiteside also pointed out that the costs for two of the contested projects were based on competitive bidding and that the costs for all four contested projects were based on Chicagoland pricing rather than on rural pricing.

¶ 68    In his own rebuttal, Walker testified that he "accept[ed Nicor's] position regarding the increased costs of construction in an urban environment and added ten percent to the revised costs in [his] analysis." Walker testified that he also "included an additional conservative modifier in [his] benchmarking analysis to account for these incremental costs in the amount of $300,000 per project." Walker explained that, by making these additions, he then accounted for "six different factors" that added costs to his benchmark basis and that his approach incorporated "many" of the variables that both he and Nicor had earlier identified.

¶ 69    In surrebuttal, Whiteside testified that Walker's act of adding 10% to his calculated benchmark was inadequate to address the differences between rural and urban pricing and did not "cure its deficiencies." Whiteside explained that this was partly because Walker had made an unreasonable and inaccurate assumption that the 10% addition would fully account for the cost differentials between urban and rural projects. Whiteside further explained that urban projects could cost two to five times more than rural projects of the same length.

¶ 70    c. *The Commission's Findings*

¶ 71    In its Order, the Commission detailed the evidence presented by both Nicor and the Attorney General and found that Nicor had not met its burden of establishing that the transmission

22

investment costs for the contested projects were reasonable and prudent. The Commission stated that "[s]imply presenting actual incurred or budgeted costs [was] not evidence of prudence and [could] not absolve [Nicor] of its statutory obligation to demonstrate prudence and used-and-usefulness." The Commission pointed to the fact, for example, that Nicor had alleged that certain work could cost more for smaller projects, but then did not identify the specific costs for such work in relation to its own projects. The Commission also pointed out that, although Nicor had further alleged that some of the costs for the contested projects were "budgeted or bid," the company made no showing that it selected the lowest bids. Additionally, the Commission found that Nicor had inadequately shown that the 10% increase that Walker added to his calculated benchmark insufficiently accounted for Nicor's work in urban areas, especially considering that Nicor's service area also included cities, towns, and suburban areas in addition to urban areas. The Commission consequently adopted the Attorney General's recommendation to disallow $28.4 million of Nicor's proposed transmission pipeline investment costs.

¶ 72                                iii. Long-Term Gas Infrastructure Plan

¶ 73          The Public Interest Organizations recommended that the Commission require Nicor to file a long-term gas infrastructure plan (infrastructure plan) every two years. Cebulko testified that "comprehensive, public planning [could] discipline Nicor's spending, help[***] the Commission assess risk to customers and the utility ***, manage the pace of the [c]ompany's investments ***, and limit customer bill impacts ***." Cebulko stated that he assumed that Illinois gas utilities engaged in planning, but that no utility plans longer than a year were made available to the public or Commission or contained sufficient detail. Cebulko explained that, consequently, it was difficult for one to determine whether the utility was choosing the "least-cost, least-risk" solution to address customer needs and whether the utility's assumptions regarding the future were reasonable.

23

Cebulko believed that public planning could help mitigate this "inherent information asymmetry" between utilities and the Commission and public and, in turn, help the Commission ensure that utilities' decisions resulted in safe, affordable, and reliable service to their customers.

¶ 74   Cebulko further recommended that Nicor identify in each of its infrastructure plans "the lowest societal cost gas distribution system investments necessary to meet customer demand and comply with public policy objectives." He also recommended that Nicor include information such as its proposed system expenditures and investments, a demonstration that the infrastructure plan would minimize rate impacts on customers, a showing that the plan would comply with all applicable rules and requirements, and mapping that shows area of risk and the locations of planned projects.

¶ 75   In its order, the Commission agreed with Cebulko that Nicor likely engaged in planning and that the fact that the company did not share its plans with the public created an information asymmetry between the company and the Commission. The Commission expressed that Nicor's lack of public planning made it difficult for the Commission, as well as the company's customers and investors, to determine whether Nicor was prioritizing investments that were likely to be used and useful. The Commission further expressed that, "to aid in [its] informed review of this and future rate increases," it would adopt some of the reporting recommendations made during the case. The Commission ultimately ordered Nicor to file an infrastructure plan every two years, beginning on July 1, 2025.

¶ 76                    II. ANALYSIS

¶ 77                    A. Standards of Review

¶ 78   Section 9-101 of the Act states that "[a]ll rates or other charges made, demanded or received *** shall be just and reasonable." 220 ILCS 5/9-101 (West 2022). Relatedly, section 9-201(c) of

24

the Act states that, "[i]f the Commission enters upon a hearing concerning the propriety of any proposed rate or other charge, *** [then] the Commission shall establish the rates or other charges *** which it shall find to be just and reasonable." *Id.* § 9-201(c).

¶ 79    "The Commission is not merely an arbitrator between the utility and parties opposing a rate change[;] it is an investigator and regulator of utilities[,] responsible for the setting of just rates for all affected by the rates." (Internal quotation marks omitted.) *Citizens Utility Board v. Illinois Commerce Comm'n*, 2018 IL App (1st) 170527, ¶ 25. Thus, when setting rates, the Commission must balance the interests of the utility and the utility's investors and customers. See *Business & Professional People*, 146 Ill. 2d at 208 ("The Commission is charged by the legislature with setting rates which are '*just and reasonable*' not only to the ratepayers but to the utility and its stockholders." (Emphasis in original.)). Specifically, this court has articulated the following:

"The Commission has the responsibility of balancing the right of the utility's investors to a fair rate of return against the right of the public that it pay no more than the reasonable value of the utility's services. While the rates allowed can never be so low as to be confiscatory, within this outer boundary, if the rightful expectations of the investor are not compatible with those of the consuming public, it is the latter which must prevail." *Camelot Utilities, Inc. v. Illinois Commerce Comm'n*, 51 Ill. App. 3d 5, 10 (1977).

¶ 80    The utility bears the burden of proving that its proposed rates are just and reasonable. 220 ILCS 5/9-201(c) (West 2022). To prove this, "the utility must show that its operating costs are reasonable, its rate base is the reasonable value of its property used for serving the public, and its rate of return on capital is the reasonable cost of the capital needed to provide the services." *Citizens Utility Board*, 276 Ill. App. 3d at 746.

25

¶ 81        The Commission "must allow the utility to recover costs prudently and reasonably incurred." *Citizens Utility Board*, 166 Ill. 2d at 121 (citing 220 ILCS 5/1-102(a)(iv) (West 1992)). " 'Prudence is that standard of care which a reasonable person would be expected to exercise under the same circumstances encountered by utility management at the time decisions had to be made.' " *Illinois Power Co. v. Illinois Commerce Comm'n*, 339 Ill. App. 3d 425, 428 (2003) (quoting *Illinois Power Co. v. Illinois Commerce Comm'n*, 245 Ill. App. 3d 367, 371 (1993)). "[T]he prudence standard recognizes that reasonable persons can have honest differences of opinion without one or the other necessarily being 'imprudent.' " *Id.* at 435. "[T]he Commission should disallow recovery of any cost of capital in excess of that reasonably necessary for the provision of services." *Citizens Utility Board*, 276 Ill. App. 3d at 746.

¶ 82        Judicial review of final orders issued by the Commission "involves the exercise of special statutory jurisdiction and is constrained by the provisions of the [Act]." *Commonwealth Edison Co. v. Illinois Commerce Comm'n*, 2019 IL App (2d) 180504, ¶ 51. Section 10-201(d) of the Act states that the "rules, regulations, orders or decisions of the Commission shall be held to be prima facie reasonable" and that the burden of proof upon all issues raised by an appeal from an order issued by the Commission is upon the party appealing from that order. 220 ILCS 5/10-201(d) (West 2022). A reviewing court is required to give substantial deference to the orders of the Commission because of the Commission's expertise and experience in the area of setting rates. *Commonwealth Edison Co. v. Illinois Commerce Comm'n*, 398 Ill. App. 3d 510, 514 (2009). Thus, a Commission regulation may be set aside "only if it is clearly arbitrary, capricious, or unreasonable." *Central Illinois Public Service Co. v. Illinois Commerce Commission*, 268 Ill. App. 3d 471, 476-77 (1994).

¶ 83    When reviewing a Commission order, courts are limited to determining the following four issues: "(1) whether the Commission acted within the scope of its authority, (2) whether the Commission made adequate findings in support of its decision, (3) whether the Commission's decision was supported by substantial evidence in the record, and (4) whether constitutional rights have been violated." *Id.* at 476. "Substantial evidence" is "evidence that a reasonable mind might accept as adequate to support a conclusion" and is "more than a scintilla of evidence but *** less than a preponderance of the evidence." (Internal quotation marks omitted.) *Save Our Illinois Land v. Illinois Commerce Comm'n*, 2022 IL App (4th) 210008, ¶ 37. If reasonable minds could differ as to where the weight of the evidence lies, then a reviewing court should defer to the Commission's finding of fact. *Id.* "The substantial-evidence standard is the same as the manifest-weight standard." *Id.*

¶ 84    "The findings and conclusions of the Commission on questions of fact shall be held prima facie to be true and as found by the Commission," except when a finding or conclusion is not supported by substantial evidence or, otherwise stated, is against the manifest weight of the evidence. 220 ILCS 5/10-201(d) (West 2022); see *People ex rel. Raoul v. Illinois Commerce Comm'n*, 2025 IL App (4th) 230491, ¶ 54. "[A] finding is against the manifest weight of the evidence if all reasonable persons would agree that the finding is erroneous and that the opposite conclusion is evident." (Internal quotation marks omitted.) *Raoul*, 2025 IL App (4th) 230491, ¶ 54.

¶ 85    Separately, we decide questions of law, such as the interpretation of statute or a regulation of the Commission, *de novo*. *Save Our Illinois Land*, 2022 IL App (4th) 210008, ¶ 42. "While we are not bound by the Commission's conclusion on questions of law, we will give substantial weight and deference to an interpretation of an ambiguous statute by the agency charged with the administration and enforcement of the statute." (Internal quotation marks omitted.) *People ex rel.*

27

*Madigan v. Illinois Commerce Comm'n*, 2011 IL App (1st) 101776, ¶ 6. The reason for this deference is that "courts appreciate that agencies can make informed judgments upon the issues, based upon their experience and expertise[,] and *** agencies must have wide latitude to adopt regulations reasonably necessary to effectuate their statutory functions." (Internal quotation marks omitted.) *Id.*

¶ 86    Additionally, mixed questions of law and fact are reviewed for clear error. *Id.* ¶ 8. A mixed question of law and fact is one that asks the legal effect of a given set of facts or, otherwise stated, "is one in which the historical facts are admitted or established, the rule of law is undisputed, and the issue is whether the facts satisfy the statutory standard, or whether the rule of law as applied to the established facts is or is not violated." *Id.* An agency decision is clearly erroneous when "the reviewing court, on the entire record, is left with the definite and firm conviction that a mistake has been committed." (Internal quotation marks omitted.) *Id.* ¶ 9.

¶ 87                                B. Capital Structure

¶ 88    First, Nicor argues that the Commission erred in numerous ways in rejecting its proposed capital structure, which Nicor asserted before the Commission reflected its actual capital structure. Nicor argues that, to start, the Commission applied the incorrect legal standard in deciding whether to adopt Nicor's proposed capital structure, in that the Commission noted in its Order the qualities of an "optimal" capital structure and that Nicor's proposed capital structure contained more common equity than "necessary." According to Nicor, by requiring that it have an "optimal" capital structure and no more common equity than "necessary," the Commission deviated from the proper legal standard, which compelled Nicor's proposed capital structure only to have been reasonable.

¶ 89    Section 16-108.5(c) of the Act mandates that the rates set by the Commission "[r]eflect the utility's actual year-end capital structure for the applicable calendar year, *** subject to a

28

determination of prudence and reasonableness consistent with Commission practice and law." 220 ILCS 5/16-108.5(c) (West 2022). "[T]he Commission shall not include any *** incremental risk *** [or] increased cost of capital *** which is the direct or indirect result of the public utility's affiliation with unregulated or nonutility companies." *Id.* § 9-230. Additionally, "the Commission should disallow recovery of any cost of capital in excess of that reasonably necessary for the provision of services." *Citizens Utility Board*, 276 Ill. App. 3d at 746. "If a utility has included excessive equity in its capital structure, it has inflated the rate of return and its capital cost." *Id.*

¶ 90        Here, the Commission's statement in its Order that Nicor's proposed capital structure contained more common equity than "necessary" corresponds with the rule noted in case law that a utility cannot recover costs beyond those that were "reasonably necessary." See *id.* Additionally, although the Commission referred to an "optimal" capital structure in its Order, as Nicor itself concedes, the Commission nevertheless correctly articulated that "a utility's actual capital structure is adopted unless it is found to be unreasonable, imprudent, or unfairly burdensome." See 220 ILCS 5/16-108.5(c) (West 2022). Further, in deciding whether to adopt Nicor's proposed capital structure, the Commission expressly considered whether the utility's proposed common equity ratio was high due to its association with unregulated entities, which accords with section 9-230 of the Act. See *id.* § 9-230. Thus, we find that the Commission applied the correct legal standard in assessing Nicor's proposed capital structure.

¶ 91        Next, Nicor argues that the Commission incorrectly ruled that its proposed capital structure was unreasonable and that the Commission's reasons for rejecting its proposed capital structure had "no basis in the record." Specifically, Nicor argues that the Commission's findings that its proposed equity ratio was high because of its association with unregulated entities and that Nicor

29

could maintain its current credit rating with a common equity ratio of 50% were both unsupported by evidence.

¶ 92　　　　Related to the Commission's finding regarding Nicor's affiliation with unregulated entities, MacLeod testified in support of Nicor's position that the fact that the company had a higher credit rating than its parent company, Southern, was not evidence that Nicor's affiliation with unregulated entities increased Nicor's cost of capital or caused Nicor to have a higher common equity ratio. He also testified that the Commission had previously taken measures to prevent Nicor's affiliation with Southern from impacting Nicor's credit quality, that Nicor had a common equity ratio of more than 54.520% "long before it was affiliated with Southern," and that Nicor had not sent dividends to Southern since 2017, which indicated that Nicor was not maintaining a higher common equity ratio than needed to service Southern.

¶ 93　　　　However, counter to Nicor's position, Kight-Garlisch explained that "[c]orporations have an economic incentive to maintain relatively low equity ratios *** at the [parent] company level while maintaining relatively high equity ratios at the utility operating company level" and that this arrangement was common between parent companies and their subsidiaries and enabled the parent companies to borrow at lower rates and then earn high equity returns through the subsidiaries. Kight-Garlisch further explained that, "[t]o service its parent's obligations, the utility subsidiary will often maintain a higher equity ratio than it otherwise would have needed, thereby increasing the utility's cost of capital." Kight-Garlisch testified that, specific to this case, Southern had "infus[ed] *** over $1 billion in equity" into Nicor since 2016, which then allowed Nicor to maintain an "excessive" common equity ratio of 54.5% and Southern to maintain its own common equity ratio of only 37%. We find that, in light of Kight-Garlisch's testimony and despite Nicor's assertions to the contrary, there was evidence of record to support the Commission's finding that

30

Nicor's proposed common equity ratio was high because of its affiliation with unregulated entities such as Southern.

¶ 94    As to the second finding by the Commission that Nicor challenges, Kight-Garlisch testified that Nicor could maintain its current credit rating with a common equity ratio as low as 50%, based on a return on equity of 9.89%. In its order, the Commission ultimately adopted a common equity ratio of 50% but authorized a return on equity of only 9.51%. Nicor now asserts that there was "[n]o evidence" that the company could maintain its current credit rating with a common equity ratio of 50%, based on a return on equity of 9.51%, rather than 9.89%. Although we acknowledge that Kight-Garlisch did not directly give an opinion on whether Nicor could maintain its current credit rating with both a common equity ratio of 50% and a return on equity of 9.51%, her testimony still constituted at least *some* evidence of this fact. Moreover, Kight-Garlisch testified that certain measures that Moody used to assess Nicor's creditworthiness "should not" have changed based on the company's revenue requirement. Thus, we determine that there was also evidence of record to support the Commission's finding regarding Nicor's ability to maintain its current credit rating.

¶ 95    Nicor further argues that it was improper for the Commission to note that the company's proposed common equity ratio was higher than those of other utilities. Nicor asserts that the capital structures of other utilities were "irrelevant" in this case because "every utility faces different financial circumstances."

¶ 96    Section 200.610(b) of the Illinois Administrative Code provides that "the rules of evidence *** applied in civil cases in the circuit courts of the State of Illinois shall be followed" in contested cases before the Commission. 83 Ill. Adm. Code 200.610(b) (2000). The Illinois Rules of Evidence govern proceedings in the courts of Illinois, and Illinois Rule of Evidence 402 states that "[a]ll

31

relevant evidence is admissible." Ill. R. Evid. 402 (eff. Jan. 1, 2011). "Relevant evidence" is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Ill. R. Evid. 401 (eff. Jan. 1, 2011).

¶ 97    In this case, the Commission does not dispute Nicor's assertion that every utility faces circumstances unique to itself. However, regardless of whether all utilities indeed differ from one another in some ways, there was nothing that precluded the Commission from believing, based on its experience, that they were all similar enough in other ways to warrant comparing their respective capital structures. There was also nothing that precluded the Commission from finding, based on such a belief, that the fact that other utilities had capital structures that contained less common equity than that proposed by Nicor made it more probable that Nicor's proposed common equity ratio was unreasonable. Consequently, we reject Nicor's argument that evidence of other utilities' capital structures was irrelevant in this case and conclude that substantial evidence supported the Commission's ultimate determination that Nicor's proposed capital structure was unreasonable.

¶ 98    However, as part of its final argument on the issue of its capital structure, Nicor points out that, in earlier cases, the Commission "had repeatedly approved [the company's] actual capital structure with ratios similar to *or even greater* than the one [the company] proposed [in this case]," despite there having been "a *greater* difference between [the company's] actual capital structure and the average capital structure for other gas utilities nationwide ***." (Emphasis in original.) Nicor further points out that the Commission had "also previously refused to accept an industry average as an appropriate benchmark for prudence, because each utility is different and faces different constraints." Nicor argues that, in rejecting the company's proposed common equity ratio

32

on the basis that it was higher than typically approved, the Commission "arbitrarily departed" from its precedent and, thus, was required to acknowledge and justify the divergence.

¶ 99        Illinois courts have consistently articulated that the doctrine of *res judicata* does not apply to Commission decisions. See, *e.g.*, *GridLiance Heartland LLC v. Illinois Commerce Comm'n*, 2023 IL App (5th) 230073, ¶ 53. Rather, the Commission has the power to deal with each situation before it, regardless of how it might have dealt with a similar or the same situation in the past. *Citizens Utility Board v. Illinois Commerce Comm'n*, 291 Ill. App. 3d 300, 307 (1997). Additionally, the Commission may change its policies regarding substantive issues, so long as the changes are not implemented in an arbitrary and capricious manner. *United Cities Gas Co. v. Illinois Commerce Comm'n*, 225 Ill. App. 3d 771, 782 (1992). However, when "the Commission departs from its 'usual rules of decision to reach a different, unexplained result in a single case,' thus depriving a party of equal treatment before the Commission, [its decision will] be entitled to less deference on review." *Abbott Laboratories, Inc. v. Illinois Commerce Comm'n*, 289 Ill. App. 3d 705, 715 (1997) (quoting *Central Illinois Public Service Co.*, 268 Ill. App. 3d at 479).

¶ 100        Here, even if it is true that the Commission has previously approved common equity ratios greater than that proposed by Nicor in this case, Nicor fails to identify a particular rule of decision from which the Commission supposedly deviated in rejecting the company's proposed common equity ratio. See 5 ILCS 100/1-70 (West 2022) (defining the term "rule" in the context of administrative agencies). Moreover, even if it is also true that the Commission has previously refused to rely upon an industry average to measure a utility's prudence, in noting in its Order that Nicor's proposed common equity ratio was greater than those typically approved, the Commission expressly stated that this consideration was "not dispositive." Thus, we find that the Commission did not deviate from any of its rules of decisions to such a degree so as to warrant us giving less

33

deference to its decision in this case. See *Citizens Utility Board*, 291 Ill. App. 3d at 304 ("[T]he Commission's decisions are entitled to less deference when the Commission *drastically* departs from past practice." (Emphasis added.)).

¶ 101                              C. Distribution Investment Costs

¶ 102        Second, Nicor argues that the Commission erred by disallowing $55.1 million of the company's proposed distribution investment costs. To start, Nicor asserts that, in its order, the Commission "held" that [the company] should not incur [infrastructure replacement] costs until replacement was immediately 'required' or 'urgently' needed." Nicor also asserts that the Commission's ruling on the issue of its distribution investment costs amounted to a "categorical finding of imprudence" that was based on the fact Nicor had proactively addressed known safety risks in its distribution infrastructure prior to any harm being imminent.

¶ 103        A review of the Order in this case shows that the Commission never once stated that Nicor was required to wait until harm was imminent or the replacement of distribution infrastructure was "immediately required" or "urgently needed" in order to recover the costs of then performing the replacement. Rather, the Commission expressly stated that it was tasked with considering multiple factors in deciding whether to approve Nicor's proposed distribution investment costs. According to the Commission, these factors included the "types of pipes to be replaced, to what degree safety and reliability [were] affected, *and importantly*, at what cost." (Emphasis added.)

¶ 104        Additionally, Nicor is correct that the Commission noted that the company had failed to establish that the replacements that it sought to complete were "required" and as "urgent[***]" as those of LPP materials. However, the Commission noted this within its broader analysis of whether Nicor had presented sufficient evidence as to each of the relevant considerations. Indeed, the Commission did not disallow a portion of Nicor's proposed distribution investment costs on the

34

sole basis that the company had failed to prove that the replacements were "immediately required" or "urgently needed." To the contrary, it denied the proposed costs on the additional basis that the Attorney General had presented more compelling evidence as to the *multiple* questions that the Commission had to consider. Thus, we reject Nicor's argument that the Commission categorically found that the company's infrastructure replacement costs were imprudent solely because the company had proactively addressed known safety risks in its gas distribution system.

¶ 105        Nicor also argues that its distribution investment costs were prudently incurred. We find the decision in *Ameren Illinois Co. v. Illinois Commerce Comm'n*, 2025 IL App (5th) 240014, to be instructive in addressing Nicor's argument.

¶ 106        In *Ameren*, Ameren Illinois Company (AIC), a natural gas utility, filed proposed tariff sheets in which it sought to recover $186 million in distribution investment costs, based on a future test year. *Id.* ¶¶ 1, 3, 6. AIC specified that it needed to invest in its infrastructure to replace the mechanically coupled steel mains and services that it contained. *Id.* ¶ 6. The company presented evidence that its mechanically coupled steel mains and services were "a 'top threat to the integrity of the distribution system,' " were " 'prone to leakage,' " and were " 'two of the [c]ompany's top leak risks.' " *Id.* The company also presented evidence that it had between 600 and 800 miles of mains with mechanically coupled steel out of its 8,900 miles of steel mains. *Id.*

¶ 107        The Attorney General recommended that the Commission disallow $45.5 million of AIC's proposed distribution investment costs. *Id.* ¶ 7. In support of this recommendation, the Attorney General argued that AIC's infrastructure did not include LPP materials and that the mechanically coupled steel in its infrastructure was not as likely as LPP materials to leak. *Id.* The Attorney General further argued that AIC had already completed "a large part of" the remediations to its gas distribution system; that, more specifically, AIC had already remediated 533 miles of mechanically

coupled steel pipes out of its estimated 1,233 miles of such pipes; and that AIC was "well ahead" of the remediation deadlines set by the applicable regulations. *Id.* Additionally, the Attorney General argued that AIC had failed to identify, "with specificity," which of its projects underlay the proposed increase in costs related to mains and services, as well as to quantify the alleged risk that AIC sought to mitigate by performing the proposed replacements. *Id.* The Attorney General argued that, thus, AIC's remediation process should be slowed. *Id.*

¶ 108    In its decision, the Commission in *Ameren* credited the testimony of the Attorney General's experts, which it found to be persuasive and reasonable. *Id.* ¶ 13. Ultimately, the Commission adopted the Attorney General's recommendation to disallow $45.5 million, or 33%, of AIC's proposed distribution investment costs. *Id.*

¶ 109    On appeal, AIC argued that the Commission had erroneously disallowed portions of its proposed distribution investment costs. *Id.* ¶ 64. In addressing this argument, the court noted that the record revealed that AIC had not compared the level of risk for mechanically coupled steel to that of LPP materials, that AIC had failed to specifically define the subset of mechanically coupled steel in its infrastructure that was at issue, and that there was no evidence that AIC had graded the risks in its infrastructure or identified which specific parts of its infrastructure were most prone to leaking or had the highest-risk leaks. *Id.* ¶ 68. The court also noted that AIC had answered the Attorney General's questions regarding the company's distribution investment costs by stating merely that bases for the costs were "safety and reliability." (Internal quotation marks omitted.) *Id.* Describing this answer as "seriously lacking in detail," the court upheld the Commission's disallowance of portions of AIC's proposed distribution investment costs. *Id.* ¶¶ 68, 71.

¶ 110    We find the facts in *Ameren* to be analogous to those in this case. To start, like AIC, who had already remediated 533 out of the 1,233 miles of its mechanically coupled steel pipes by the

36

time of its proposal, Walker testified that Nicor had already reduced the LPP mains and services in its gas distribution system by 83% and 88.5%, respectively, by the time of its own proposal. Also like AIC, who the Commission found had not compared the risk level for mechanically coupled steel to that of LPP materials, the Commission in this case similarly found that Nicor had not shown that the qualifying vintage material that it sought to replace posed similar risks as LLP materials. Additionally, AIC and Nicor both attempted to justify their distribution investment costs by stating that they were incurred to ensure the safety and reliability of their gas distribution systems, but the Commission similarly found in both cases that the companies' justifications lacked sufficient detail. Because of these similarities, we follow the court in *Ameren* by analogously finding that the Commission's determination in this case to disallow $55.1 million of Nicor's proposed distribution costs was proper, despite the evidence presented by the company.

¶ 111                                D. MAOP Investment Costs

¶ 112        Third, Nicor argues that the Commission erred by disallowing $43.3 million of its MAOP reconfirmation investment costs. Nicor also asserts that the Commission's determination was "fatally flawed in several respects" where the Commission stated that, because "Nicor *** [was] well ahead of its MAOP reconfirmation and [had] not sufficiently demonstrated the reasonableness of the 2024 MAOP budget, including identifying specific projects and scope of work, the Commission believe[d] a pause was necessary until the Company [had] properly planned and justified its MAOP costs."

¶ 113        Returning to the *Ameren* decision, the Commission there disallowed 75% of AIC's proposed MAOP investment costs and required AIC to submit a Compliance Plan to "assist the Commission in assessing whether AIC was fairly considering its options when pursuing MAOP reconfirmation work." *Id.* ¶ 22. In arriving at its decision, the Commission found that the record

37

was insufficient to approve AIC's proposed MAOP investment costs, in light of "AIC's lack of detail on a per-project basis and other reasonable potential (and less costly) alternatives," as well as the fact that "AIC did not 'enable the Commission, Staff, or stakeholders to recreate, verify, or assess [AIC's] analysis.' " *Id.* ¶ 21.

¶ 114    The Commission in *Ameren* also found that it had been shown that AIC would accomplish 50% compliance with the MAOP Rule in 2023 and full compliance by 2028, "nearly seven years before the 2035 compliance deadline." *Id.* ¶ 22. The Commission further found that the evidence supported its concerns " 'with the cost and pace of the Company's MAOP reconfirmation efforts.' " *Id.*

¶ 115    On appeal, the court in *Ameren* considered whether the Commission's disallowance of 75% of AIC's proposed MAOP investment costs was proper. *Id.* ¶¶ 73-87. The court began by noting that, in documentation that it had submitted to the Commission, AIC had outlined each of its MAOP projects and explained the company's reasons for using replacement to remediate the pipeline segments at issue. *Id.* ¶ 85. The court stated that, thus, "[t]he Commission decision ignore[d] the evidence where AIC explained why it chose each MAOP reconfirmation method," and further noted that AIC had explained "that the appropriate method of reconfirmation depended on numerous factors." *Id.*

¶ 116    The court in *Ameren* also noted that AIC had provided a timeline for its planned MAOP reconfirmation showing that reconfirmation would occur over the next eight years as follows: "2023-20.3 miles, 2024-11.2 miles, 2025-11.4 miles, 2026-6.5 miles, 2027-14.2 miles, 2028-8.9 miles, and 2030-0.9 miles." *Id.* ¶ 86. The court also found "[e]qually concerning" the fact that the Commission had "simply eliminated" all of AIC's MAOP projects, despite the fact that some of the projects included "MAOP reconfirmation work that was not based on main replacement as well

38

as projects that did not involve MAOP reconfirmation." *Id.* ¶ 87. The court found that the Commission's decision to disallow 75% of AIC's proposed MAOP investment costs was not supported by substantial evidence. *Id.* However, the court did express, as a final note, that it found "it disingenuous for the Commission to penalize AIC for allegedly failing to \*\*\* meet a standard not previously required—*i.e.*, a MAOP and Records Compliance Plan—prior to the issuance of the Commission decision, especially when it provided the statutorily required information." *Id.*

¶ 117 As was similarly so in *Ameren*, the Commission in this case expressed a concern that Nicor had been frontloading its MAOP work and ordered Nicor to file a compliance plan. Nicor also presented evidence that it used "a comprehensive process to analyze pipeline segments requiring reconfirmation to determine appropriate actions to achieve reconfirmation" and considered factors such as the company's ability to reduce pressure, the company's ability to take the pipeline segment out of service, impact to customers, and financial impact.

¶ 118 However, unlike AIC in *Ameren*, which submitted documentation to the Commission that outlined each of its MAOP projects and explained the company's reasons for using replacement to mediate the pipeline segments at issue, the Commission in this case found that Nicor had not identified its specific MAOP projects or the scope of the work involved in each project, which Nicor does not now dispute. Also unlike AIC, which provided a timeline for its planned MAOP reconfirmation, in this case, Walker testified that Nicor had outright stated that it did not have a time-based plan for replacement and refused to state the year in which it would achieve 100% compliance with the MAOP Rule. Without this depth of information having been provided, we are unable to determine, as the court analogously did in *Ameren*, whether the Commission in this case improperly disallowed a sweeping 75% of Nicor's proposed MAOP investment costs despite some of the costs arising outside of any pipeline replacement or MAOP reconfirmation work. Thus, we

39

uphold the Commission's determination in this case to disallow $43.3 million of Nicor's proposed MAOP investment costs.

¶ 119    Last on this issue, Nicor argues that the Commission's decision regarding the company's proposed MAOP investment costs in this case constituted a departure from its decisions in "at least two prior rate cases." Nicor points out that, in these prior rate cases, the Commission approved Nicor's proposed MAOP investment costs that were "presented with the same degree of specificity" as in this case, despite the Attorney General having made "the same" arguments. Nicor asserts that, in deviating from its decisions in these prior cases, the Commission was required to acknowledge its "prior practice" and justify its deviation therefrom.

¶ 120    Otherwise stated, Nicor's present argument seems to be that the Commission should have approved the company's proposed MAOP investment costs in this case because it had approved such costs under similar circumstances in past cases. However, as we earlier articulated, orders by the Commission do not have the effect of *res judicata*, and the Commission has the authority to address each matter before it freely, even if a matter involves issues identical to those previous. *Commonwealth Edison Co. v. Illinois Commerce Comm'n*, 2016 IL 118129, ¶ 24. Thus, we find Nicor's argument to be meritless.

¶ 121                          E. Transmission Pipeline Investment Costs

¶ 122    Fourth, Nicor argues that the Commission erred by disallowing $28.43 million in proposed transmission pipeline investment costs. Specifically, Nicor argues that the Commission's finding that the company did not demonstrate that such costs were reasonable and prudent with respect to the four contested projects was "manifestly incorrect" because, in so finding, the Commission "ignored" the evidence that Nicor had presented in support of its proposal.

40

¶ 123    In its Order, the Commission detailed at great length the evidence that Nicor had presented to support its proposed transmission pipeline investment costs. The Commission noted, for example, that Nicor had presented evidence that, in conducting his industry-standard cost analysis, Walker had improperly relied on model projects that had "nothing in common with the [c]ompany's projects *** other than the pipeline diameters[***] and presented different economies of scale and construction challenges." The Commission further noted Nicor's additional evidence that the transmission pipeline investment costs for two of the contested projects were based on competitive bidding and that the costs for all four contested projects were based on Chicagoland pricing. Additionally, the Commission acknowledged that Nicor had presented evidence that Walker's 10% increase to his calculated benchmark was "neither reasonable or accurate" because the increase did not fully account for the cost differences between urban and rural projects, with urban projects tending to be longer and more expensive because of numerous factors. The Commission detailed Nicor's evidence to the extent that it negated any suggestion that the Commission did not consider it. Thus, we reject Nicor's argument that the Commission "ignored" its evidence.

¶ 124    However, Nicor further argues that the Commission's disallowance of $28.43 million of its proposed transmission pipeline investment costs was erroneous for the additional reason that the decision was not supported by substantial evidence. In support of the disallowance, Walker testified that, according to the industry-standard cost analysis that he had conducted, the contested projects had a per Dia-inch-Mile cost that was "significantly higher" than his calculated benchmark and that Nicor's proposed transmission pipeline investment costs were unreasonable. Walker also explained his methodology in conducting the industry-standard cost analysis and later increased his calculated benchmark by 10% to account for numerous factors that Nicor identified specific to

41

projects in urban areas. Although Nicor argued that the 10% increase to Walker's calculated benchmark insufficiently accounted for the company's work in urban areas, the Commission found that Nicor had not sufficiently shown the ways in which the increase was insufficient.

¶ 125          In determining that Nicor's evidence was inadequate, the Commission further noted that, despite the fact that the company alleged that certain work could cost more for smaller projects, it did not offer evidence of what such work would specifically cost in the context of its own projects. Additionally, the Commission acknowledged Nicor's evidence that the some of the costs for the contested projects were "budgeted or bid," but commented on the fact that Nicor had provided no evidence to show that it necessarily selected the lowest bids. Based on such a showing by both Nicor and the Attorney General, we find that the Commission's disallowance of $28.43 million of Nicor's proposed transmission pipeline investments costs was supported by substantial evidence.

¶ 126                              F. Long-Term Gas Infrastructure Plan

¶ 127          Fifth, Nicor argues that the infrastructure plan should be vacated because the Commission exceeded the scope of its authority under the Act by ordering it. Nicor also argues that the Commission's "new rule" imposing an infrastructure plan was invalid because the Commission did not conduct the required "notice-and-comment" process under the Illinois Administrative Procedure Act (5 ILCS 100/1-1 *et seq.* (West 2022)).

¶ 128          "The Commission, because it is a creature of the legislature, derives its power and authority solely from the statute creating it ***." *City of Chicago v. Illinois Commerce Comm'n*, 79 Ill. 2d 213, 217-18 (1980). Thus, any acts that the Commission performs outside of its statutory authority are void as being beyond its jurisdiction. *Id.*; see *Business & Professional People for the Public Interest v. Illinois Commerce Comm'n*, 136 Ill. 2d 192, 243 (1989).

¶ 129    The Commission ordered the infrastructure plan in this case pursuant to sections 4-101, 9-201(c), 9-211, and 8-501 of the Act. The Commission also cited *Abbott Laboratories*, 289 Ill. App. 3d 705, in support of its order. In assessing whether these sources authorized the Commission to order the infrastructure plan, we turn once more to the decision in *Ameren*, which we again find to be instructive.

¶ 130    In *Ameren*, the Commission noted, on the issue of an infrastructure plan, that, "while AIC likely engaged in internal system planning, AIC d[id] not submit a public long-term system plan, which create[d] an inherent information asymmetry between [AIC] and the Commission." (Internal quotation marks omitted.) *Ameren*, 2025 IL App (5th) 240014, ¶ 31. The Commission explained that "AIC's lack of transparent planning processes made it challenging for the Commission, customers, and other stakeholders to determine whether AIC was prioritizing prudent investments that were likely to be used and useful." (Internal quotation marks omitted.) *Id.* The Commission also expressed that "AIC's capital spending (and associated planning, budgeting, and project section processes) merit[ed] careful consideration in [that] and future rate cases." (Internal quotation marks omitted.) *Id.* The Commission then ordered AIC to file an infrastructure plan every two years, beginning on July 1, 2025, and cited sections 4-101, 9-201(c), 9-211, and 8-501 of the Act and *Abbott Laboratories*, 289 Ill. App. 3d at 712, to support its order. *Ameren*, 2025 IL App (5th) 240014, ¶ 31.

¶ 131    On appeal, the court analyzed whether the Commission had the authority to order AIC to file an infrastructure plan. *Id.* ¶¶ 64-71. The court first noted that the Commission's order regarding the infrastructure plan was "not applicable to the *current* case" before the Commission, but rather, "provide[d] a requirement solely for *future* cases." (Emphases added.) *Id.* ¶ 92. The court then noted that Public Act 102-662 (eff. Sept. 15, 2021) imposed long-term planning requirements for

43

electric utilities but not for gas utilities, and explained that, if the legislature had intended for the Commission to have the power to order infrastructure plans for utilities, then it would have had no need to mandate long-term planning requirements for electric utilities in Public Act 102-662. *Ameren*, 2025 IL App (5th) 240014, ¶¶ 93, 95-96. The court also found "equally relevant" that the Commission's rules already outlined the information that utilities were required to provide to support their capital recovery requests and stated that, if the Commission truly had the power to order infrastructure plans, then it could have just amended its rules to require the additional desired long-term planning information. *Id.* ¶ 97.

¶ 132    Next, the court found that the Commission's mandate of an infrastructure plan constituted a "rule" subject to the Illinois Administrative Procedure Act, which, the court explained, set forth certain "public notice and comment" requirements that agencies must follow in enacting "rules." A "rule" was defined as an "agency requirement that prescribe[d] law or policy affecting the private rights or procedures of people or entities outside [the] agenc[ies]." *Id.* ¶¶ 98, 101, 103. The court concluded that the Commission had failed to comply with the notice and comment provisions of the Illinois Administrative Procedure Act and, consequently, "vacate[d] the Commission's requirement to prepare a long-term *** infrastructure plan as void for being outside the Commission's authority." *Id.* ¶ 103.

¶ 133    The Commission in this case ordered an infrastructure plan that was nearly identical to that in *Ameren*, pursuant to identical authority and after making highly similar findings. See *Northern Illinois Gas Co.*, Ill. Comm. Comm'n No. 23-0066, at 248-49 (Order-Final Nov. 16, 2023). We find no reason to depart from the court's analysis and decision in *Ameren*. Therefore, we similarly vacate the infrastructure plan in this case on the grounds that the Commission exceeded its authority by ordering it.

¶ 134                                    III. CONCLUSION

¶ 135          For the reasons stated herein, we affirm the Commission's orders adopting the imputed capital structure proposed by Staff and disallowing $55.1 million of Nicor's proposed distribution investment costs, $43.3 million of the company's MAOP investment costs, and $28.4 million of the company's proposed transmission pipeline investment costs. We vacate the Commission's order requiring Nicor to file an infrastructure plan.

¶ 136          Affirmed in part and vacated in part.

*Northern Illinois Gas Co. v. Illinois Commerce Comm'n*, 2025 IL App (3d) 240093

| | |
|---|---|
| **Decision Under Review:** | Petition for review of order of the Illinois Commerce Commission, No. 23-0066. |
| **Attorneys for Appellant:** | John E. Rooney, of Benesch Friedland Coplan & Aronoff LLP, and Clifford W. Berlow and Marjorie R. Kennedy, of Jenner & Block LLP, both of Chicago, for petitioner. |
| **Attorneys for Appellee:** | Brian J. Dodds, Robert W. Funk, and Thomas R. Stanton, Special Assistant Attorneys General, of Illinois Commerce Commission, of Chicago, for respondent. |